## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## PFIZER, INC., Respondent.

### No. 79-2540.

United States Court of Appeals,
Seventh Circuit.

Heard June 10, 1980.

Decided Sept. 19, 1980.

Richard S. Zuckerman, NLRB, Washington, D. C., for petitioner.

Robert Broderick, Belleville, Ill., for respondent.

Before CUMMINGS and BAUER, Circuit Judges, and CROWLEY, District Judge.*

PER CURIAM.

The National Labor Relations Board has petitioned for enforcement of its order directing defendant Pfizer, Inc. to offer Houston J. Alexander immediate employment as a probationary laborer with rights and privileges dating from December 4, 1974.[1] According to the Board, Pfizer violated Sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act (29 U.S.C. §§ 158(a)(1) and 158(a)(3)) when it refused to hire Alexander because of his previous union activities.[2] Since the Board has not adduced substantial evidence to support its findings of anti–union animus, we deny enforcement of the Board's order.

Pfizer, Inc., a Delaware corporation, owns and operates a manufacturing plant in East

---

* The Honorable John Powers Crowley, District Judge of the Northern District of Illinois, is sitting by designation.

1. The Board's order also included the customary cease and desist language and a directive to post a specified notice.

2. Section 8(a)(1) makes it an unfair labor practice "to interfere with, restrain, or coerce employees in the exercise of" their rights of collective action under Section 7 of the Act. Section 8(a)(3) makes it an unfair labor practice "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization."

St. Louis, Illinois, producing iron oxide pigment, a coloring agent used in paints and building supplies. In 1978, Pfizer had collective bargaining agreements with three unions, including Local 1950, Painters and Allied Trade Unions, AFL–CIO, representing all of the company's regular hourly employees. Local 1850 is the bargaining unit for the great majority of company positions, including the laborer position at issue in this case, and enjoys a union security arrangement for those positions, requiring union membership by the employees after 60 days' employment. Notwithstanding the usual pattern of employee grievances and complaints, Pfizer and its officers have maintained a harmonious working relationship with all unions and during its 17 years of operations at the East St. Louis plant had not, until this case, been the target of any unfair labor practice charge.

As a major employer in the depressed East St. Louis area, Pfizer receives more than a thousand applications for employment each year. When Pfizer determined in the fall of 1978 that it would need three additional laborers, James F. Murphy, the plant personnel manager, set in motion the company's customary procedure of handling this volume of applications. That procedure includes the screening of about 100 of the applications kept on file and the selection of from four to six applicants for personal interviews. If the interview with an applicant produces favorable results, Murphy then asks the applicant to schedule a medical examination at company expense and has a reference check performed. The hiring decision is made after these latter steps are completed.[3]

Among the applicants Murphy chose to interview for the laborer position in 1978 was Houston J. Alexander, an employee at Obear–Nester Glass Co., which was discontinuing its operations in East St. Louis. All parties agree that Alexander's interview

proceeded very favorably, and that Murphy showed great interest in Alexander's experience and qualifications. The two did not discuss union activity at the interview except that Murphy apparently informed Alexander that the company's union security agreement would require Alexander to join Local 1850 after a specified period (Exh. 6 at 3). At the end of the interview, Murphy asked Alexander to take the medical examination "as soon as possible" (Tr. 73). He also asked Alexander for employment references and informed him that someone would contact the persons whose names he supplied.

Alexander left the interview with the impression that he would be hired (Tr. 75). The evidence suggests, however, and the ALJ found, that Murphy told Alexander that he would let him know about the position "one way or the other" only after the other two steps were completed (App. 5, 8). Alexander subsequently took and passed the medical examination. Murphy also interviewed other applicants, one of whom was Henry Lofton, also an employee at Obear–Nester. Lofton's interview apparently resulted in a similarly favorable determination. Like Alexander, Lofton thereafter took and passed the medical examination.

Murphy entrusted the reference check of Alexander to John C. Watts, the industrial relations supervisor at the Pfizer plant. Following the ordinary procedure, Watts telephoned Obear–Nester, and having reached Sharon Bauer, Obear–Nester's industrial relations supervisor, asked her ten predetermined questions from a standard reference form. Watts noted each of Bauer's responses on the form without additional comment or inquiry. Only a few of Bauer's responses are relevant here. After providing basic salary and grade information, as well as confirming Alexander's explanation that he was the victim of an

---

**3.** The Administrative Law Judge (ALJ) found that although "Pfizer's policy is not to hire employees who are unable to pass the company physical examination, * * * there is no established policy prohibiting it from hiring an employee who has unfavorable references"

(App. 3). We do not believe anything substantial turns on this observation, particularly since there was no evidence that the company did hire persons whose references were unsatisfactory.

economic layoff, Bauer answered question 4, which sought her assessment of Alexander's "ability" and "job performance," by saying that she could "not speak favorably." To the fifth question regarding Alexander's "weak points" or specific problems, Bauer described him as an "ex–president of the Union who tends to be an instigator." The sixth query, inquiring into Alexander's relations with other employees brought the terse response: "A troublemaker." Finally, after describing Alexander's attendance as "acceptable" and offering nothing noteworthy about financial or personal troubles, Bauer answered the tenth question by stating that she would not consider Alexander for reemployment and would "[a]dvise any company to stay away from him if you don't need further problems." (App. 22–23.)

Watts reported the results of the reference check to Murphy in a brief conversation at the end of a subsequent working day. It is clear Watts reported that the reference check of Alexander had turned out unfavorably without showing Murphy the notes he had jotted down to reflect Bauer's responses. Less certain is how much detail about his conversation Watts actually supplied to Murphy. Watts testified before the ALJ that he merely told Murphy the overall result and that he himself relied only upon responses four and ten (Tr. 17, 18). The ALJ thought it incredible that Watts would provide no explanation or that Murphy would have asked for none, given the poor report. The ALJ therefore discredited Watts' testimony. Murphy testified before the ALJ that Watts told him that Alexander had had performance problems and trouble getting along with others. He also indicated that Watts told him that Alexander had been union president. Because Murphy had earlier stated in an affidavit that he could not "recall if [Alexander] had a poor attendance or work record," the ALJ also discredited Murphy's testimony insofar as it suggested that Bauer's reference to union activity had not influenced Murphy's evaluation. The ALJ concluded that Murphy and Watts had specifically considered Bauer's response to question 5,

which noted Alexander's record as an "instigator" and union president.

After the conversation with Watts, Murphy decided not to hire Alexander. Murphy did hire Lofton, who, as a similar reference check had disclosed, was a union steward at Obear–Nester. After receiving his December 4, 1978, rejection letter, Alexander filed an unfair labor practice charge with the Board on January 18, 1979, alleging that Pfizer's refusal of employment constituted violations of Sections 8(a)(1) and 8(a)(3) of the Act. Thereafter, Alexander also filed a charge against Obear–Nester. The resulting complaints were consolidated and referred to an ALJ, but immediately before a hearing was to commence, the charge against Obear–Nester was settled. The hearing proceeded against Pfizer alone, with Murphy, Watts and Alexander appearing as the sole witnesses.

The ALJ concluded that the company had indeed violated the Act. Relying in part on the credibility resolutions noted above as well as the written record of Watts' telephone conversation with Bauer, the ALJ determined that the evidence regarding the basis of Murphy's decision "shows a concentration and particularization of only one element: That Alexander was an instigator and troublemaker because of his status as ex–president of the Union" (App. 12). The ALJ also noted that in his affidavit Murphy admitted that his policy was not to hire an applicant whose prior employer would not rehire him and that this policy applied regardless of the prior employer's reasons and regardless of the role union activities had in the prior employer's decision. Such a policy, the ALJ noted, was itself illegal. (App. 13.) Finally, the ALJ found that Pfizer's long record of good union relations did not indicate a different result.

Noting that the reference check was the sole reason Alexander was not hired, the Board upheld the ALJ's findings, adding that "[t]he whole theme of the information received was that Alexander was an ex–union president and a troublemaker." The Board held that this characteristic rendered the reference check unlawful as a whole

and precluded any use of the check by Pfizer in making an employment decision. Concluding therefore that "the sole and only basis for the refusal to hire Alexander was an unlawful one" (App. 19), the Board adopted the remaining findings and proposed order of the ALJ.

■ There can be no dispute that a refusal to hire, like a decision to discharge, is a violation of Section 8(a)(3) of the Act, if based on anti–union considerations. *Phelps Dodge Corp. v. National Labor Relations Board*, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271. It is also true that in handling such discrimination claims this Court looks not to whether anti–union considerations were a "but for" cause of the action, but rather to whether such animus accounted for any significant part of the employer's motivation. *St. Luke's Memorial Hospital v. National Labor Relations Board*, 623 F.2d 1173 (7th Cir., 1980). The gravamen of this principle is that the actual motivation of the company decision–maker, not the objective circumstances that may or may not be known to him at the time, will determine the outcome of a case. As a result, to find a violation in this case, the Board had to conclude that Murphy knew of and relied on Alexander's union activities in deciding not to hire him. A careful review of the record finds a dearth of support for this conclusion.

It is worth noting at the outset that the standards applied by this Circuit mean that the modifications the Board made in the ALJ's findings are of doubtful validity. As noted, the Board found that the reference report was illegally tainted, that any reliance upon it would constitute a violation of the Act, and that Murphy could not therefore make a decision using any information derived from that report. This conclusion runs afoul of the fact, uncontested by the Board, that Murphy never actually saw the report and had to rely on Watts for his information. It is difficult to conclude that Murphy's motives were tainted without a showing that he was aware of the alleged anti–union basis for the negative responses of Bauer.

The ALJ took a more appropriate approach by attempting to show a link between Murphy's motives and Alexander's union activities. The asserted link depends on a string of inferences, some of which are simply unsupported by the record. First, the ALJ found that Bauer's responses actually derived from anti–union considerations. The Board did submit evidence that Alexander's relationship with Obear–Nester, and Bauer in particular, had been acrimonious, in part because of Alexander's union activity. But the evidence did not show definitively that union considerations rather than, for example, personal dislike influenced Bauer's judgment when she spoke with Watts. That Alexander's file at Obear–Nester contained no negative reports does not conclusively demonstrate that Bauer could not have been offering a good faith professional assessment of Alexander's attitude. It is possible that apart from his union activity Alexander did have problems with some other employees and his position as a union official cannot insulate him from the consequences. As a result, if union considerations did play a role in Bauer's evaluation, it is uncertain to what extent.

Second, and more importantly, the ALJ specifically found that whatever Bauer's motives, Pfizer was unaware of Alexander's specific difficulties with Bauer and Obear–Nester. To maintain the link, the Board found that the anti–union basis of the negative reference report is pellucid once the responses are viewed as a whole. We do not share the Board's view. Bauer's response to only one of the ten questions contains any reference to Alexander's union activities. That the negative character of the response relates to the union reference is itself not without doubt, but assuming that it does, it is far from clear that all of the unfavorable remarks similarly derive from that source. Question 4, for example, requested comment only on "ability" and "performance," and Watts may well have viewed Bauer's unfavorable response as completely unrelated to her subsequent remark about union activity. The ALJ's ap-

proach to the reference report threatens to preclude automatically any use of such a reference check once it discloses any union activity whatsoever. Such a presumption is inconsistent with the fact–finding responsibilities of the Board, and we decline to adopt it.

Even if the Board's evidence were to overcome these hurdles, demonstrating that Watts "must" have understood what Bauer "must" have meant, a further obstacle to a finding of anti–union animus on Murphy's part is the lack of any concrete evidence of what Watts conveyed to Murphy. Watts testified that he told Murphy only that the reference check had proved unfavorable. The ALJ found this testimony incredible, and though Murphy's affidavit provided some initial support for Watts' account, Murphy's testimony at the hearing was that Watts gave him some of the detail regarding the conversation with Bauer and did mention that Alexander had been a member of the union. The ALJ was therefore entitled to resolve the credibility question on this point against Watts and conclude that some detail was discussed. It is another matter though to determine what specifically Watts said about the connection between Alexander's union role and the unfavorable remarks. For example, even assuming, as we have, that Watts understood Bauer to mean that Alexander was a troublesome union organizer, Watts may have told Murphy of Alexander's union involvement only as an independent fact. Indeed, the only direct evidence on this question is Murphy's testimony that Watts told him that Alexander had been union president, a statement Murphy characterized as unconnected with the otherwise unfavorable reference report.

Still a fourth dubious inference is necessary to pass from a finding that Watts conveyed some relationship between Alexander's union activity and some of Bauer's unfavorable responses to the ALJ's conclusion that Murphy's conversation with Watts focused on that one element. The ALJ adopted this inference because of some apparent inconsistencies in Murphy's statements; yet these inconsistencies are not so

striking as to warrant the ALJ's quantum leap in reasoning. For example, Murphy stated in his affidavit that he did not recall whether Alexander had a poor attendance or work record, and the ALJ found that Murphy contradicted that statement at the hearing by testifying that Watts told him that Alexander had had performance problems and trouble getting along with others. It is noteworthy that only part of this latter response is inconsistent with the affidavit statement. More importantly, Murphy's position in the affidavit was that he chose not to hire Alexander simply because Obear–Nester would not rehire him. The contradiction thus goes not to the reasons Murphy had for his decision but merely to the detail with which he recalled the underlying basis of Obear–Nester's evaluation. The ALJ also found fault with Murphy's flat statement in his affidavit that he would not hire an employee if the previous employer would not rehire him because Murphy added during the hearing that he would inquire further if the previous employer had clearly listed union troubles as a reason. This latter statement is not so much an inconsistency as an amplification of Murphy's earlier response. As a result, the inconsistencies the ALJ found in Murphy's statements are weak support for the significant step of concluding that Murphy and Watts must have not only discussed Alexander's union activity, but actually focused on that activity in their brief discussion of the unfavorable reference check.

To be sure, inconsistencies such as these, especially when coupled with findings by the ALJ about witness demeanor, may under some circumstances give rise to a suspicion that the true role of anti–union considerations is being concealed. Nevertheless the ALJ made no substantial comment on demeanor, and the other elements surrounding the hiring decision suggest that a benign interpretation of Murphy's statements is appropriate. Murphy is a labor relations expert of long experience, working in a plant that is fully unionized. Far from evincing any hostility to unions, he actually informed Alexander in his inter-

view that eventual union membership was mandatory. In addition, at the very same time Murphy declined to hire Alexander, he did hire Lofton, who, as Murphy knew, had been a union steward at Obear–Nester. These factors support an appropriate reading of Murphy's activities, even assuming Watts did draw some connection between Bauer's report and Alexander's union activities, that Murphy may well have discounted any union references in making his decision.

At most, this record of inference built upon inference supports a conclusion that Murphy's decision derived in part from a report he knew included some anti–union sentiments. It is conceivable that a reference check that is to be a primary factor in a hiring decision and that betrays strong anti–union sentiments among the remarks could give rise to a duty upon the subsequent employer to investigate the source of all the remarks. In this context, in which Murphy relied on a conversation with Watts who relayed information with an uncertain relationship to union matters, no such duty arises. The labor laws do not require an employer to ensure that every decision he makes is objectively free from every remote possibility of taint.[4] Furthermore, that Murphy may have been aware of some anti–union sentiments in the report does not alter our conclusion that no violation of the Act has been demonstrated here. As this Court has recently noted, "[w]e will not lightly infer the existence of an unlawful motive on the part of an employer," and consequently that "[a] colorable inference of a partial unlawful motive may * * * be so insignificant as to be de minimis." *Pelton Casteel, Inc. v. National Labor Relations Board*, 627 F.2d 23, at 30 (7th Cir. 1980). It is apparent to us that Murphy's primary reason for rejecting Alexander had more to do with his scruples about hiring employees rejected by their own employers. If Alexander's union activities may have

provided some of the basis for the report Murphy relied on, Murphy also had available much additional information, not connected with union matters, in applying his general policy. Such a situation is precisely the one contemplated by our *de minimis* rule. See *Pelton Casteel, Inc. v. National Labor Relations Board, supra.*

In sum, although in a purely objective sense, the original source of Alexander's unfavorable reference report and therefore his failure to gain employment may have been Bauer's reaction to Alexander's previous union activity, this Court looks to motivation, not to such a "but for" cause in reviewing Section 8(a)(3) charges. As a result, the Board's reasoning that the reference check was tainted as a whole, precluding any reliance on it, represents an impermissible abstraction from the subjective inquiry demanded by our precedents. At the same time, the ALJ has attempted to meet our requirement of substantial evidence of unlawful motivation by offering only a chain of highly questionable inferences that are fully consistent with benign conduct. At the most, these inferences produce a conclusion that possibly some small part of Murphy's motivation derived from union considerations, a conclusion simply too weak to comply with our *de minimis* rule. Therefore the Board was wrong in requiring Pfizer to hire Alexander as of December 4, 1974, when Pfizer rejected his employment application.

Enforcement denied.

---

4. Since the parties have not viewed the violation of Section 8(a)(1) as an independent issue, we do not decide whether a company's decision not to hire an employee may give rise to an 8(a)(1) violation if the report is based objectively upon a report influenced by anti–union considerations, if the anti–union character of the report or the employee's previous union activities are well known to other employees.