**SULLAIR P.T.O., INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 80–2093.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 7, 1981.

Decided Feb. 19, 1981.

Harry Sangerman, Chicago, Ill., for petitioner.

Robert Sewell, N.L.R.B., and Elliott Moore, Washington, D.C., for respondent.

Before CUMMINGS and CUDAHY, Circuit Judges, and BONSAL, Senior District Judge.*

CUMMINGS, Circuit Judge.

This matter is before us on a petition of Sullair P.T.O., Inc. pursuant to 29 U.S.C. § 160(f) to review and set aside a final order of the National Labor Relations Board issued against Sullair on July 15, 1980, and reported at 250 NLRB No. 104. The Board has cross-applied for enforcement of its order. We hold that the Board's findings do not support its legal conclusion and therefore deny enforcement.

**I**

Sullair, the wholly owned subsidiary of a larger corporate enterprise, is engaged in the manufacture, sale and distribution of air compressors installed as power-take-off units. Sullair's home office is in Michigan City, Indiana, and it does business in Indiana and elsewhere. The events giving rise to this dispute occurred at its plant in New Buffalo, Michigan, which employs approximately 12 production and maintenance workers. These employees are not represented by a union.

Among the fringe benefits Sullair provided its New Buffalo employees from 1975 to 1979 was the opportunity to buy unlimited quantities of gasoline at 35¢ per gallon. On

May 31, 1979, Sullair posted on the New Buffalo plant bulletin board a notice that because of increasing cost and a shortage with its suppliers, starting June 1 employees would be able to buy only 10 or 15 gallons of gasoline per week, depending on whether they lived in New Buffalo or out of town, at a cost of 50¢ per gallon "until the shortage lessens with our suppliers."

Later that day,[1] General Manager William A. Jones was stopped on the shop floor near some employees who had questions and complaints about the changed gasoline policy. One of these employees was Terry Lee Boyle, who had been employed by Sullair as a mechanic at the plant since November 1977. Boyle told Jones that Sullair was "f_____g" the employees by the new policy and asked how he, Boyle, was going to be able to afford the price increase "on his f_____g salary." Jones suggested that Boyle could get another job if he thought he could do better. Jones then told the employees he would try to find out whether the change was temporary or permanent and that Sullair's Controller and Human Relations Committee would investigate the matter.

The next day, June 1, 1979, at the request of another employee, Plant Controller Douglas Sommers, who was subordinate to Jones, met in the shop lunchroom with seven or eight of the 12 employees to discuss the gasoline policy. During this meeting, Boyle became the primary employee speaking out against the change. When he asked Sommers "what the f__k" could be done about the change, Sommers replied that it was a policy change by the parent corporation. Thereupon Boyle said Sullair was attempting "to f__k the employees" and then asked if those "rotten m____r f_____g c_____s" at the main plant would ration gas there if there had been a gas shortage at the New Buffalo plant. Sommers told Boyle that he would be glad to

---

* The Honorable Dudley B. Bonsal, Senior District Judge of the Southern District of New York, is sitting by designation.

1. It is immaterial whether this incident occurred on May 31 as the parties' briefs state, or on June 1st as the Administrative Law Judge found (App. 14, 15). The record is unclear on the matter.

stand there to talk about the gas program but not with Boyle's using such profanity. Sommers added that if Boyle were unhappy he could get a job somewhere else. Boyle said that if that was Sommers' answer, he was a "f_____g poor manager."

Sommers immediately went to Jones' office and told him what had occurred. Ten to 20 minutes after the meeting had ended, Jones fired Boyle for "insubordination," reminding him of a previous incident in December 1978 when Boyle had been orally reprimanded for insubordination after complaining that he was being "f____d again" by the company and calling Jones a liar. On that occasion Jones warned Boyle that he would be terminated if such insubordination happened again and that he must not direct vulgar shop language toward management.[2]

Three days after Boyle's discharge, Jones and Sommers prepared two memoranda for Boyle's personnel file reciting complaints about Boyle and his work. These memoranda indicate that Boyle was warned orally on January 11, 1979, to refrain from his continual complaining because it was having a detrimental effect on working conditions[3] and that on February 13 and May 9 other employees complained to management that it was difficult to work with Boyle because of his negative attitude.

On June 26, Boyle filed with the Board an unfair labor practice charge against Sullair asserting that he was wrongly fired for insubordination to Sommers. After a hearing, the Administrative Law Judge concluded that Boyle was engaged in activity protected under Section 7 of the National Labor Relations Act (29 U.S.C. § 157) when he voiced his June 1st complaint about the changed gasoline policy, that his obscene language in the course of the protest was not so serious as to deny him the Act's protection, and that Sullair had violated Section 8(a)(1) of the Act (29 U.S.C. § 158(a)(1)) by discharging Boyle for engaging in protected activity.

The Board affirmed these findings and ordered Sullair to offer to reinstate Boyle, to expunge from its records any reference to the discharge, to make Boyle whole for any loss of pay and benefits suffered, and to post an appropriate notice. The order also required Sullair to cease and desist from the unfair labor practice found and from interfering in any like or related manner with employee rights under Section 7. This petition for review followed.

## II

It is undisputed that Boyle was engaged in a concerted activity protected under Section 7 when he used the obscene language. In *Dreis & Krump Manufacturing Co., Inc. v. National Labor Relations Board*, 544 F.2d 320, 329 (7th Cir. 1976), this Court stated that "communications occurring during the course of otherwise protected activity remain likewise protected unless * * * 'so violent or of such serious character as to render the employee unfit for further service.'" While it is for the Board to make an initial determination whether allegedly offensive conduct or language exceeds the protection of the Act, its determination will be disturbed on review when "illogical or arbitrary." *National Labor Relations Board v. Thor Power Tool Co.*, 351 F.2d 584, 587 (7th Cir. 1965). Here we conclude that Boyle's insubordination clearly justified his discharge and that the Board's contrary determination was illogical and arbitrary.

The Administrative Law Judge found that the June 1st obscenities interspersed with Boyle's complaints about the gasoline policy were not so serious as to exceed the Act's protection because they were (1) not beyond the pattern of vulgar "shop talk" prevalent in the plant and (2) not directed at Sommers personally (App. 21–22). The record shows that employees at the plant

---

**2.** It makes no difference whether warnings are oral or written. *Coors Container Co. v. National Labor Relations Board*, 628 F.2d 1283, 1287 (10th Cir. 1980).

**3.** At this meeting in Jones' office, Boyle was at least cautioned, if not formally warned, about his future behavior.

were in fact given great latitude in lodging complaints and that the usage of vulgar or obscene words of sexual connotation was relatively common and tolerated. However, the record also shows that Boyle was an easily excitable person who used vulgar "shop talk" more than other employees and that in spite of warnings he did direct his obscenities at management. Finally, the record shows that the vulgar expressions used by Boyle at the June 1 meeting were directed at management and that he called Sommers a "f_____g poor manager."

We cannot condone Boyle's use of such vulgarities directed at management and Sommers in front of other employees, causing three of them to leave the meeting. It is clear that Boyle was fired shortly afterwards for insubordination in accordance with his December 7th warning and not because he protested the new gasoline policy. The record is devoid of anything to the contrary. Other employees who questioned the gas policy on May 31 and June 1 were not disciplined, and Sommers was willing to continue the dialogue with them until Boyle's disruptive behavior ended the June 1 meeting. Indeed, Boyle admitted in his charge lodged with the Labor Board that he was fired for his insubordination to Controller Sommers. More important, the Administrative Law Judge (whose decision was adopted with an immaterial exception by the Labor Board) twice found that Boyle's June 1st conduct was the overriding reason for his discharge (App. 21). We conclude therefore that the record as a whole fails to support the Board's determination that the overriding reason for Sullair's discharge of Boyle following the June 1st meeting was his vigorous protest of the changed gasoline policy rather than his outrageous behavior punctuated by shouted obscenities.

### III

Our holding here is consistent with our recent decision in *National Labor Relations Board v. Truck Drivers, Oil Drivers, Etc.*, 630 F.2d 505 (1980) (hereafter *"Teamsters Local 705"*). There the executive officer of the employer issued two employees a warning in December 1976 that they would be dismissed unless their work records improved. In April 1977, instead of following established procedures for seeking pay increases, the employees distributed a letter repeating their wage demands to the employer's executive board during a political luncheon for Chicago's then mayor, "to the potential embarrassment" of their employer (at p. 508). That afternoon they were fired for insubordination. Although the Labor Board held that the employees were engaged in activity protected by Section 7 of the Act and therefore ordered their reinstatement with back pay, we denied enforcement of the order. Our rationale was that in these circumstances "the employer's right to performance of assigned duties in a loyal manner" overbalanced the employee's right to petition (at p. 509). The panel added (*ibid.*):

> "The National Labor Relations Act is directed toward recognition of the legitimate rights of both employer and employees, 29 U.S.C. § 141(a). There must be room in the law for a right of an employer somewhere, some time, at some stage, to free itself of continuing, unproductive, internal, and improper harassment."

*Teamsters Local 705* was based on sound precedent. As the Fifth Circuit stated in *Florida Steel Corporation v. National Labor Relations Board*, 529 F.2d 1225, 1234 (1976):

> "Section 7 rights are a shield against employer retaliation, not a sword with which one may threaten or curse supervisors. *Corriveau & Routhier Cement Block, Inc. v. NLRB*, 410 F.2d 347, 350 (1st Cir. 1969). Neither threats of violence nor insubordination constitute protected activities."

Thus in *Chemvet Laboratories, Inc. v. National Labor Relations Board*, 497 F.2d 445 (8th Cir. 1974), the court reversed the Labor Board's order requiring Chemvet Laboratories to offer employee Connie Ellis reinstatement to her job with make-whole pay. Before the regular quitting time she ceased production and was told by one of

the two principal shareholders of the company that it was not yet time to quit and to return to work. However, Ellis refused to do so and referred to the shareholder as a "son-of-a-bitch." When she continued to refuse to work, she was discharged. Although the Administrative Law Judge found, as here, that vulgar language was not uncommon in the plant, those using it, apart from Ellis, did not refer to their supervisors in profane terms in their presence. Because of her aggravated conduct toward a superior, the court held that Section 7 did not operate to suspend the company's right to discharge Ellis for cause (497 F.2d at 452).

Similarly, in *National Labor Relations Board v. Prescott Industrial Products Company*, 500 F.2d 6 (8th Cir. 1974), the court refused to enforce the Labor Board's order to reinstate with back pay three employees who had been discharged for insubordination where the employees had been disruptive and used abusive language directed at management during a plant manager's lawful speech to a group of employees.

Finally, in *Boaz Spinning Company v. National Labor Relations Board*, 395 F.2d 512 (5th Cir. 1968), the company had discharged R. C. Alexander for insubordination. During a meeting called by the plant manager, the employees were told they could not make speeches but that after the plant manager's speech he would try to answer any employee questions. When Alexander attempted to make a talk after the close of the plant manager's speech, the plant manager told him to sit down until the plant manager finished answering questions. However, after sitting down momentarily, Alexander jumped up and pointed his finger at the plant manager and said that he was "no different than Castro." Alexander was thereupon fired for insubordination. The court of appeals agreed with the trial examiner that Alexander's Castro remark was made in a deliberate and defiant manner and was a form of flagrant disloy-

alty warranting his immediate discharge. The Labor Board had disagreed with the trial examiner and ordered his reinstatement. There, as here, the employee was violating the employer's rules and using intemperate language in front of other employees. Consequently, the company was upheld in ordering his discharge and the Board's petition to enforce its order was denied.

In our view, the above-cited authorities control the disposition of this case, where Boyle's complaint about Sullair's new gas policy was not even "a motivating factor" in his discharge. See *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471, *Wright Line, A Division of Wright Line, Inc.*, 251 NLRB No. 150 (August 27, 1980). Since Boyle's offensive conduct on June 1st was found by the Labor Board to be "the overriding reason" for his discharge,[4] Sullair did not violate Section 8(a)(1) of the Act. Accordingly, enforcement will be denied.

---

4. Our own decisions hold a discharge to be illegal if a "bad" motive contributes in a significant way to the discharge. *E. g., National Labor Relations Board v. Pfizer, Inc.*, 629 F.2d

1272, 1275, 1277 (7th Cir. 1980) (*per curiam*). Here there was no substantial evidence to support a finding of a bad motive.