WEIRTON STEEL, DIVISION OF NA-
TIONAL STEEL CORPORATION,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 82–1026.

United States Court of Appeals,
Fourth Circuit.

Argued July 20, 1982.

Decided Sept. 20, 1982.

Rehearing and Rehearing En Banc
Denied Oct. 19, 1982.

Carl H. Hellerstedt, Jr., Pittsburgh, Pa. (Joseph Mack, III, Thorp, Reed & Armstrong, Pittsburgh, Pa., on brief), for petitioner.

Peter Winkler, Washington, D.C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Kenneth B. Hipp, Deputy Asst. Gen. Counsel, Washington, D.C., on brief), for respondent.

Before RUSSELL, WIDENER and HALL, Circuit Judges.

K. K. HALL, Circuit Judge:

Weirton Steel Division of National Steel Corporation (Weirton) seeks review of the order of the National Labor Relations Board (the Board) finding it in violation of §§ 8(a)(1), (3) and (5) of the National Labor Relations Act (the Act). Finding the Board's decision unsupported by substantial evidence, we deny enforcement of the order.

The controlling issue presented to the Board was whether Weirton bargained in good faith in regard to a stock investment

plan (SIP), during collective bargaining negotiations with its salaried employees and the Independent Steelworkers Union. The administrative law judge (ALJ) found that Weirton had refused to bargain in good faith with the Union over the SIP, thereby violating § 8(a)(5) of the Act. Furthermore, the ALJ held that Weirton violated §§ 8(a)(1) and (3) of the Act by denying salaried employees the benefit of the SIP for the sole purpose of restraining and coercing them, and other employees of National Steel Corporation, from Union activity. The Board adopted the ALJ's findings and ordered Weirton to bargain in good faith over the SIP, to make its employees whole for the benefits denied them as a result of the discontinuance of the SIP, and to post an appropriate notice. On appeal, we must determine whether substantial evidence in the record supports the Board's decision.

### I.

Weirton Steel is a subdivision of National Steel Corporation engaged in the manufacture and non-retail sale of steel and steel products in Weirton, West Virginia and Steubenville, Ohio. Weirton has two main categories of employees: (1) hourly workers who are involved in the direct production process and are represented by the Independent Steelworkers Union and (2) salaried office and technical workers who until 1978 were not represented by a union. Before unionization, the salaried employees had the option of participating in a stock investment plan, whereby as much as 7½ percent of their gross pay could be used to purchase National Steel Corporation stock, with the company contributing a matching amount. Individual employees could alter the percentage they set aside each year or enter or withdraw from the plan as they chose. The plan was administered by a trustee of the company who could discontinue the matching aspect, if the economic condition of the company required such.

In 1978 the salaried employees of the Weirton division selected the International Steelworkers Union as their representative.

Between January of 1979 and August of that year, collective bargaining negotiations were held between Weirton and the Union. Weirton's chief spokesman was John McCreary, Vice-President of Industrial Relations, while the Union was represented by a committee composed of nine employees. The Union's chief spokesman was David Robertson, a lawyer. In all, thirty-four negotiating sessions took place. All but one of the meetings were transcribed.

The Union initially presented approximately one hundred demands to Weirton. Only four of these demands specifically addressed the SIP.

The record reveals that it was not until the seventh meeting that the SIP was even discussed, at which time McCreary related that Weirton's position was not to offer such a plan to organized employees. During meeting nine, he elaborated upon Weirton's position, noting that the SIP was a fringe benefit not provided to organized salaried employees within the steel industry, as it was "prohibitively expensive." At meetings ten and eleven the Union withdrew all of its demands for improvement in the SIP and proposed continuation of the plan as it then existed, which was rejected by McCreary. During meetings twelve and thirteen the Union asked if Weirton's position in regard to the SIP had changed, and after being told that it had not, initiated no further discussion.

The SIP was not mentioned again by either party until meeting eighteen, when McCreary reported to the Union on his discussion of the SIP with National's management. He reiterated Weirton's position that the SIP could not be continued. He later testified that the Union was told at this time "that the company was losing a lot of money ... through the month of April, 1979, something in the excess of seventeen million dollars."

On May 31, 1979, at meeting nineteen, McCreary stated that "I didn't say I wasn't willing to talk about it," when asked about the stock program. He continued:

> Somebody down at the end of the table asked me specifically about the stock

plan, and I said I was willing to entertain union proposals. I am willing to entertain any union proposals, obviously, for alternatives to the stock plan. Whether or not I can do anything about them at this point, I can't say.

Over the next six sessions the parties negotiated over various other matters, not involving the SIP. On July 23, 1979, at meeting twenty-six, bargaining over "out-of-line differentials" (O.L.D.) became intense.[1] The record reveals that McCreary presented the Union with three alternative solutions to the O.L.D., one of which was to accept the Union's proposal in exchange for the Union dropping its demand for the SIP. In response to a question concerning whether the company's position toward the SIP was negotiable, McCreary responded, "Certainly. Everything is negotiable." A compromise on the O.L.D., not involving the SIP, was reached two meetings later.

The next and most controversial negotiation session was unrecorded and occurred on August 8, 1979. It involved seven Union committeemen minus their attorney on the one side, and McCreary and two additional company negotiators on the other. The meeting was called by the Union members, who according to their testimony, were "fearful of union decertification and frustrated over the bargaining pace." Testimony by the committee members revealed that much confusion, conflict and memory lapse existed concerning the date of this meeting, the persons in attendance, the topics discussed, and the responses given by McCreary during the session. Several Union members testified that they clearly recalled McCreary stating that if the employees forgot about the Union they could retain the SIP. Others could remember no such statement, while three employees completely denied that such a promise was ever made. McCreary testified that he said nothing during that meeting about the SIP that had not been said on the record before. His statement was substantiated by the two

other Weirton negotiators who were present at the unrecorded session.

Formal negotiations resumed on August 13, 1979, at which time McCreary stated that Weirton could not agree to the SIP due to the added costs associated with the negotiation and maintenance of a union, which could be recouped through the money previously allocated to the stock plan. He also voiced Weirton's concern that if an SIP were given to one labor organization, other similar groups would demand it as well. During this same meeting, McCreary, in response to a hypothetical question concerning what would happen to the SIP if the Union was decertified, stated that:

> If you were to get decertified, it does not make a whole helluva lot of sense for the company to change it at that point, but I really have not thought about it.
>
> But off the top of my head, I cannot see any advantage to the company doing that.

In the final four sessions of bargaining an agreement was reached on the remaining issues, of the pay scale, pay retroactivity, lunch hour pay and paid union stewards. There was no discussion of the SIP. On August 30, 1979, a collective bargaining agreement covering both bargaining units was signed. No mention was made of the SIP. Thereafter, the Union filed an unfair labor practice charge against Weirton, claiming that it had refused to bargain in good faith about the SIP, and had illegally withheld this plan from the salaried employees.

## II.

Under § 8(a)(5) of the Act, 20 U.S.C. § 158(a)(5), it is unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees...." "[C]ollective bargaining" is defined in § 8(d), 29 U.S.C. § 158(d), as "the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith

1. Out-of-Line Differentials are salaries in excess of the standard normally paid to a person

in a particular position.

with respect to wages, hours, and other terms and conditions of employment ... but such obligation does not compel either party to agree to a proposal or require the making of a concession." In *NLRB v. Insurance Agents' International Union,* 361 U.S. 477, 486, 80 S.Ct. 419, 425, 4 L.Ed.2d 454 (1960), the Supreme Court closely examined the above statutory language, and held that collective bargaining requires good faith, and "presupposes a desire to reach ultimate agreement, to enter into a collective bargaining contract." In *NLRB v. Stevenson Brick & Block Co.,* 393 F.2d 234 (1968), we addressed this same issue, and noted that a determination of whether employer-union negotiations were conducted in "good faith" involves subjective factors which must be considered in light of the facts of the particular case.

■ The standard of review for NLRB decisions was established in *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951), where it was held, "that a reviewing court is not barred from setting aside a National Labor Relations Board decision when it cannot conscientiously find the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to [the] Board's view." In viewing the collective bargaining that occurred between Weirton and the Union, the record reveals that, although Weirton remained firm concerning the disallowance of the existing stock investment plan, it did not simply refuse to discuss the matter and was willing to discuss possible economic alterna-

tives. Further, Weirton made concessions and compromises in other areas, such as retroactive pay raises, extended lunch periods and pay for union stewards, that provided employees with benefits not previously enjoyed, and which led to ratification of the agreement.

The ALJ placed great weight upon the August 8, unrecorded negotiation session, previously described. However, as the testimony from the members of the employees committee was vague and surrounded by conflict, and since the ALJ mistakenly found that none of the company representatives had testified to this meeting, little reliance can be placed upon any aspect of it. In sum, after viewing the record in its totality, we find substantial evidence does not support the Board's decision.[2]

■ Moreover, public policy dictates that a party who: (1) never expressed any reservation of rights or indicated that the company's bargaining had been unlawful, (2) could have continued bargaining but chose not to, (3) ratified the agreement and accepted its benefits, and (4) had a viable agreement as to all aspects of the contract, should not be permitted to later complain of an injustice. Exactly three months after the contract had been ratified, in accordance with the Union bargaining committee's recommendation, the Union filed the unfair labor practice charge against Weirton. Prior to that, the record is silent as to any allegation by the Union of bad faith bargaining, on the part of Weirton, or of any Union discontentment regarding the ratified contract.[3]

---

2. *Kroger Company v. NLRB,* 401 F.2d 682 (6th Cir. 1968) *cert. denied* 395 U.S. 904, 89 S.Ct. 1742, 23 L.Ed.2d 217 (1969), a case cited by the Board, is inapposite from the present case because Kroger *refused* to discuss their profit sharing plan or a substitute benefit with any union representative. In the instant case, the record shows that Weirton never took the position that it would not discuss the SIP or alternative economic plans with the union representatives.

3. The instant case is distinguished from *General Electric Co. v. NLRB,* 414 F.2d 918 (4th Cir. 1969), where the company and union negotiat-

ed a grievance procedure as part of the contract. Throughout the collective bargaining sessions, the company steadfastly refused to permit the union's expert the opportunity to obtain independent time study information, which the union deemed essential for intelligent participation in this grievance process. The contract was executed without any specific reference to this matter following which the union filed a grievance against the company claiming violations of §§ 8(a)(1) and (5) of the Act. We held that the union was entitled to their own information, as this was necessary for effective participation in the grievance procedure. In other words, the information was

### III.

■ Since we find that Weirton bargained in good faith over the SIP, the Board's determination that Weirton refused to grant SIP benefits to salaried employees as a means of discouraging Union employment, which constituted §§ 8(a)(1) and (3) violations, is also in error. Furthermore, as we find no violation under the Act, discussion of the Board's make-whole remedy is unnecessary. Accordingly, we deny enforcement.

ENFORCEMENT DENIED.

necessary to make this agreement between the two parties viable.

Contrary to our holding in *General Electric*, the agreement between Weirton and the Union, regarding the SIP, required nothing further in order to become viable. It was simply a negotiated item that was not included in the ratified contract.