394 F.3d 207
 MEDIA GENERAL OPERATIONS, INCORPORATED, d/b/a Winston-Salem Journal, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
National Labor Relations Board, Petitioner,
v.
Media General Operations, Incorporated, d/b/a Winston-Salem Journal, Respondent.
 No. 04-1222.
 No. 04-1339.
 United States Court of Appeals, Fourth Circuit.
 Argued: October 1, 2004.
 Decided: January 10, 2005.
 
 1
 ARGUED: Glenn E. Plosa, Zinser Law Firm, P.C., Nashville, Tennessee, for Media General Operations, Incorporated, d/b/a Winston-Salem Journal. Jason Walta, National Labor Relations Board, Washington, D.C., for the Board. ON BRIEF: L. Michael Zinser, Zinser Law Firm, P.C., Nashville, Tennessee, for Media General Operations, Incorporated, d/b/a Winston-Salem Journal. Arthur F. Rosenfeld, General, John E. Higgins, Jr., Deputy General, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General, David Habenstreit, Supervisory Attorney, National Labor Relations Board, Washington, D.C., for the Board.
 
 
 2
 Before WILLIAMS and SHEDD, Circuit Judges, and Henry E. HUDSON, United States District Judge for the Eastern District of Virginia, sitting by designation.
 
 
 3
 Petition for review is granted and cross-petition for enforcement of the NLRB Order is denied by published opinion. Judge Hudson wrote the opinion, in which Judge Williams and Judge Shedd joined.
 
 HUDSON, District Judge:
 
 4
 Media General Operations ("the Company") petitions this Court to review a decision and Order of the National Labor Relations Board ("the Board"), and the Board cross-petitions for enforcement of its Order. The Board's decision overturned the administrative law judge's ruling and held that the Company had suspended, and then discharged, an employee in retaliation for engaging in protected Union activities. For the following reasons, the petition for review is granted, and the cross-petition for enforcement of the NLRB Order is denied.
 
 I.
 
 5
 The Company operates the Winston-Salem Journal ("the Journal"), a daily newspaper whose press employees were represented by the Graphic Communications International Union ("the Union"). The discharged employee, John Mankins ("Mankins"), had worked for the Company for sixteen years and served as the Union's Vice-President and Assistant Chairman on his shift.
 
 
 6
 In or about July 2001, Mankins raised concerns with his supervisor, Danny Leonard ("Leonard"), that his fellow employee, Ricky Smith ("Smith"), was neglecting his duties due to his excessive socializing with Leonard. According to the Union, Mankins was not the only employee complaining about Leonard and Smith's interactions on company time. The Union had also echoed these concerns to the company president, but not directly to Leonard.
 
 
 7
 On or about December 14, 2001, Leonard called the press employees together to discuss deficiencies in their work performance, which he had observed the previous evening. His comments were loudly interrupted by Mankins, who vocalized his belief that Leonard did not treat everyone equally. He called Leonard a "racist" and stated that the newspaper was a "racist" place to work. In response, Leonard told Mankins to raise these issues with the production director, Sam Hightower ("Hightower").
 
 
 8
 About an hour after the meeting, Leonard asked Mankins to come to his office. Mankins did not request Union representation at this meeting. There, Leonard instructed Mankins that "his behavior on the floor was very unacceptable," that it would "not be tolerated," and that "if he ever displayed it again," he would be "sent home." Leonard then told Mankins to go back to work. Mankins objected to Leonard's instructions and once again called him a "racist" and reiterated his belief that the Journal was a "racist" place to work. Leonard then suspended Mankins and instructed him to go home.
 
 
 9
 Mankins walked out of the office and through the "Quiet Room," which is a short-cut to the locker room.[1] Leonard followed him. As Mankins was leaving the "Quiet Room," he called Leonard a "b_ _ _ _ _ d" and a "redneck son-of-a-b_ _ _h." At no time during which these comments were made by Mankins did he represent that he was speaking in his capacity as a Union member.
 
 
 10
 On December 17, 2001, Mankins telephoned Hightower and requested a meeting. Mankins, Hightower and the Journal's Director of Human Relations, Randall Noftle ("Noftle"), attended the meeting. Mankins was not accompanied by Union representation. At this meeting, Mankins initially denied that he had cursed at Leonard or that his behavior was disruptive, even though several employees present at the December 14, 2001 meeting had signed statements attesting to Mankins's comments and behavior. By the end of the meeting, Mankins admitted that his behavior may have gotten a little out of hand.
 
 
 11
 The Journal investigated the incident, and then met with Mankins and his Union representative on December 19, 2001. At that meeting, Mankins was terminated for having called Leonard a "b_____d" and a "redneck son-of-a-b____h." The termination letter stated that Mankins's conduct had been "disrespectful of Mr. Leonard's position and authority and represent[ed] serious insubordination that cannot be tolerated."
 
 
 12
 On December 27, 2001, the Union filed a grievance protesting the termination. Shortly thereafter, Mankins filed his own complaint with the Board and with the Equal Opportunity Employment Commission. The NLRB General Counsel ("General Counsel") issued a Complaint in the case on March 28, 2002. The Complaint, which had been amended twice prior to a two-day hearing before an administrative judge, alleged that the Company had violated 29 U.S.C. § 158(a)(1) and (3) ("the National Labor Relations Act" or "the Act") by suspending Mankins in retaliation for his alleged protected Union activity and by firing Mankins in retaliation for continuing his alleged protected activity.
 
 
 13
 Following a hearing, the General Counsel moved in a post-hearing brief to amend its Complaint to add an additional unfair labor practice charge. Specifically, the General Counsel alleged that the Company had violated 29 U.S.C. § 158(a)(1) by threatening to discipline Mankins in retaliation for his alleged protected Union activity. The Company opposed the motion in a separate filing and moved to reopen the record to admit information that had not previously been admitted into evidence.
 
 
 14
 On October 9, 2002, Administrative Law Judge George Carson, II ("ALJ") held that there was no evidence that any action taken towards Mankins had been retaliatory in nature, rather it was in response to his disruptive behavior. The ALJ found that there was no evidence that Mankins had been engaged in Union activities. Mankins's out-burst at the meeting was not orchestrated, rather it was spontaneous. Further, it was the manner in which Mankins spoke, and not the content of his speech, that led Leonard to request Mankins's presence in his office.
 
 
 15
 Moreover, the ALJ did not find that any threats were made by Leonard relating to "protected" activity when he warned Mankins that if he did not "calm down" that he would be "sent home." Based on these findings, the ALJ denied the General Counsel's Motion to Amend the Complaint and recommended that the Board dismiss the entire case. The General Counsel filed an exception to this recommendation. The Company, however, failed to timely file a response.
 
 
 16
 On January 30, 2004, the Board overturned the ALJ's decision. The Board held that Mankins, despite the manner in which he addressed his supervisor, had engaged in protected activity when he initially spoke up at the crew meeting due to his position as an officer of the Union. The Board found that it was obvious to most of the individuals present at the crew meeting that Mankins's remarks referred to Leonard's favoritism of certain employees. Further, it was determined that Mankins never lost the protection of the Act during his subsequent statements to Leonard because his comments were a continuation of their previous discussion and were provoked by Leonard's threats of suspension. Additionally, the Board allowed the post-hearing amendment of the Complaint. Based on its findings, the Board held that the Company had violated the Act when it threatened, suspended, and ultimately discharged Mankins for engaging in protected activity. It ordered the Company to reinstate Mankins, award him backpay, and refrain from continuing its unlawful labor practices. From the Board's Order, the Company has filed the present appeal, and the General Counsel has cross-petitioned for enforcement.
 
 II.
 
 17
 The scope of review of the Board's decision is limited. "If the Board's legal interpretations are rational and consistent with the Act, they will be upheld by reviewing courts." Sam's Club, a Div. of Wal-Mart Stores, Inc. v. NLRB, 173 F.3d 233, 239 (4th Cir.1999). A reviewing court, however, is "obligated to correct errors of law made by the Board." Va. Concrete Co. v. NLRB, 75 F.3d 974, 980 (4th Cir.1996). "The findings of the [Board] with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." 29 U.S.C. § 160(e) (2004). However, this Court "is empowered to set aside a Board's decision when the Court cannot conscientiously find substantial evidence to support the Board's decision, when reviewing the record as a whole including the body of evidence opposed to the Board's view." NLRB v. Transpersonnel, Inc., 349 F.3d 175, 180 (4th Cir.2003) (citing Weirton Steel v. NLRB, 689 F.2d 504, 507 (4th Cir.1982)).
 
 III.
 
 18
 The issue to be decided in this case is whether Mankins's outrageous comments and behavior are considered "protected activity" under Section 7 of the Act, and if so, whether his behavior was so offensive as to take it outside of the protection of the law. Section 7 provides that, "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their choosing, and to engage in other concerted activities for the purpose of collectively bargaining or other mutual aid or protection...." "The term `concerted activity' is not defined in the Act but it clearly enough embraces the activities of employees who have joined together in order to achieve common goals." NLRB v. City Disposal Systems, Inc., 465 U.S. 822, 830, 104 S.Ct. 1505, 79 L.Ed.2d 839 (1984) (citing Meyers Industries, Inc., 268 N.L.R.B. 493, 494-495 (1984)). An individual employee may be engaged in concerted activity when he acts alone if the purpose of his acts are to enforce a collective bargaining agreement, seeking to induce group action, or acting on behalf of a group. See Blaw-Knox Foundry & Mill Machinery, Inc. v. NLRB, 646 F.2d 113, 116 (4th Cir.1981). After examining Mankins's words and actions, and the context in which they were used, we find that there was no tenable excuse for his behavior that would justify terming it protected "concerted activity."
 
 
 19
 Words such as "b_ _ _ _ _d," a "redneck son-of-a-b_ _ _h," and other words of similar import, are devoid of substantive content and of meaningful value that could convey a message of grievance or concern. They are simply words of offense. Mankins did not use these derogatory statements in a manner to emphasize a message, or in response to a question soliciting the Union's opinion on a matter. Mankins threw out these offensive phrases in his supervisor's office after being told that his disruptive behavior was unacceptable. After receiving this counseling, Mankins chose to repeat his coarse behavior in the "Quiet Room," where he was no longer involved in a conversation with his supervisor. His comments there were completely unprovoked. Mankins may have been an officer in the Union, but that alone did not warrant invocation of protection under Section 7. In order to invoke the mantel of his Union office, he must demonstrate some nexus between the words he uttered and protected activity.
 
 
 20
 The determination of whether an action is "protected" is based on its purpose. See Joanna Cotton Mills Co. v. NLRB, 176 F.2d 749, 753 (4th Cir.1949) ("Where there is a bona fide concerted activity for any of the purposes named in the statute, its protection will not be denied because of the motives of those engaging in the activity; but it is not the motive of the participants that we are concerned with here but the `purpose' of the activity."). A person must act for the purpose of inducing or furthering group action. See Blaw-Knox Foundry & Mill Machinery, Inc., 646 F.2d at 116. In speaking one-on-one with his supervisor and as he walked out of the "Quiet Room," there were no other fellow Union members present that could have been moved by Mankins to join in his cursing crusade. Moreover, his words had no substantive content or value that could have assisted even one member of the Union in furthering a cause. A reflection of Mankins's words and actions could only lead to one conclusion: his derogatory attacks were merely a manifestation of his personal sentiments towards his supervisor, not an expression of Union opinion. Such personal missions are not the sort of concerted activity which the statute protects. See Joanna Cotton Mills Co., 176 F.2d at 753.
 
 
 21
 Moreover, the act that precipitated Mankins's behavior in the office and "Quiet Room," specifically his conduct in the employee meeting, also did not fall within the protection of the Act. In a meeting called for the purpose of discussing deficiencies in the employees' work product, Mankins shouted out that his employers were "racists." In some situations the word "racist" may be used in a manner to communicate a legitimate concern of prejudice in the workplace. This was not the case here. Without any underlying facts justifying Mankins's repetitive use of the word, this Court cannot find that his acts were "protected."[2] The offensive manner in which Mankins used the word to describe his employers was purely pejorative, and was intended to convey his personal sentiments. The use of the word "racist" in this setting and context merely served to stoke the intensity of his disruptive behavior. Mankins's intolerable actions warranted a firm admonition and his subsequent suspension for continued disruptive behavior. This Court finds that the NLRB's findings to the contrary are unsupported by substantial evidence.
 
 
 22
 For engaging in such unprotected insolent behavior, the Journal was justified in suspending and then terminating Mankins's employment. "It has often been stated that insubordination and refusal to obey instructions constitute reasonable grounds for disciplining an employee, and discharge for insubordination or refusal to obey instructions is perfectly lawful." NLRB v. Consolidated Diesel Electric Co., 469 F.2d 1016, 1025 (1972) (citing Visador Co. v. NLRB, 386 F.2d 276, 281 (4th Cir.1967)). Membership in the Union did not immunize Mankins against discipline for his personal misbehavior. Nor does the Act shield against the consequences of insubordinate behavior if the disciplinary act was not motivated by anti-union animus. See NLRB v. Brown, 380 U.S. 278, 286, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965). "Discipline of an employee is a matter left to the discretion of the employer." Consolidated Diesel Electric Co. 469 F.2d at 1025 (quoting NLRB v. Ogle Protection Service, Inc., 375 F.2d 497, 505-506 (6th Cir.1967)). And, "it is not an unfair labor practice to discharge an employee for exhibiting a defiant and insulting attitude towards his [supervisor]." Maryland Drydock Co. v. NLRB, 183 F.2d 538, 540 (4th Cir.1950). Thus, it was the Journal's prerogative to suspend and then terminate Mankins for his egregious behavior.[3]
 
 
 23
 Even if this Court accepted the Board's tenuous finding that Mankins's conduct on December 14, 2004 was attributable to a comment that he had made six months earlier to his supervisor regarding favoritism in the workplace, his offensive behavior still fell outside of the protection of the Act. "Not all conduct that can, in some general sense, be characterized as an exercise of a right enumerated in section 7 is afforded the protection of the Act." Texas Instruments, Inc. v. NLRB, 637 F.2d 822, 830 (1981) (citing NLRB v. Local 1229 IBEW, 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed. 195 (1953)). "Concerted activity that ... constitutes insubordination or disloyalty may be found to fall outside the scope of the NLRA even if undertaken in the interest of self-organization or collective bargaining." Id.The Court cannot fathom more offensive derogatory terms than the ones Mankins recited in the workplace. The Journal's intolerance of his behavior is certainly understandable. Thus, the crude and socially unacceptable nature of Mankins's remarks placed him outside of the broad boundaries of the Act.
 
 
 24
 If Mankins's actions had been considered "protected," then this case would be analogous to Sullair P.T.O., Inc. v. NLRB where an employee's actions, although protected, exceeded the tolerance of the Act. 641 F.2d 500 (7th Cir.1981). In Sullair, a disgruntled employee used a number of similar expletives when he complained to his supervisor about a change in company policy that financially impacted its employees. As in this case, the supervisor warned the employee not to engage in offensive behavior, to which the employee replied using further profanity. The court held that it could not condone the use of such vulgarity directed at management. "Communications occurring during the course of otherwise protected activity remain likewise protected unless... `so violent or of such serious character as to render the employee unfit for further service.'" Id. at 502 (quoting Dreis & Krump Mfg. Co., Inc. v. NLRB, 544 F.2d 320, 329 (7th Cir.1976)). The court denied enforcement of the NLRB Order, finding that the employee's foul and abusive conduct was the overriding reason for the proper discharge.
 
 
 25
 In reviewing the record below as a whole, we find an absence of sufficient evidence to support the Board's finding that Mankins's conduct was protected by the Act. We believe that Mankins's comments were beyond the pale, and the Journal acted properly in discharging him for insubordination. Accordingly, the Order of the Board is set aside and enforcement is denied.
 
 
 26
 
 PETITION FOR REVIEW IS GRANTED AND CROSS-PETITION FOR ENFORCEMENT OF THE NLRB ORDER IS DENIED
 
 
 
 
 Notes:
 
 
 [1]
 The "Quiet Room" contains equipment used to set the presses
 
 
 [2]
 The ALJ, whose findings were not overturned by the Board, found that there was no evidence of anti-union animus by the Journal towards its employees
 
 
 [3]
 In light of the above decision, the Court need not reach the issue raised in the post-hearing amendment to the Complaint or whether the amendment was acceptable