**PACEMAKER YACHT COMPANY, A DIVISION OF MISSION MARINE, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 81–1036.

United States Court of Appeals, Third Circuit.

Argued Sept. 15, 1981.

Decided Oct. 30, 1981.

Bruce L. Harrison, Capehart & Scatchard, P. A., Moorestown, N. J., for petitioner.

Penny Pilzer (argued), William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliot Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., for respondent.

Carl L. Taylor (argued), Joel W. Nomkin, Kirkland & Ellis, Washington, D. C., for the Chamber of Commerce of the U. S., amicus curiae.

Before SEITZ, Chief Judge, and ADAMS and GARTH, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Chief Judge.

Pacemaker Yacht Company (the Company) petitions for review of a final order of the National Labor Relations Board (the Board) directing the Company to cease and desist from restraining or coercing employ-ees in the exercise of rights protected by section 7 of the National Labor Relations Act, 29 U.S.C. § 157 (1976), and to reinstate employees who had been fired for striking. The Board has cross-applied for enforcement of its order. This court has jurisdiction under 29 U.S.C. § 160(e) & (f) (1976).

## I.

In 1978, the Company and Teamsters Union 158 (the Union) were parties to a collective bargaining agreement covering employees at two plants in New Jersey. The agreement required the Company to contribute forty cents per hour worked by each employee to the Teamsters Health and Welfare Fund of Philadelphia and Vicinity— Local 158. The Fund retained an independent insurance carrier to underwrite employee health and welfare benefits. The Company was not involved in the administration of the Fund, and at all times fulfilled its obligation under the collective bargaining agreement.

In early 1978, the Fund failed to pay premiums to the insurance carrier, and consequently the underwriter refused to pay the claims of the employee beneficiaries. On June 20, 1978, most employees at both plants went on strike in protest of the Fund's delinquency. Throughout the day, Union officials advised striking employees that the work stoppage violated the collective bargaining agreement and urged them to return to work. The Company mailed a notice to all employees advising them that the strike violated Article X of the collective bargaining agreement, which prohibited "all strikes, picketing ... or other interruption of the Company's operations," and stating that any employee who failed to report to the next shift would "be considered to have quit his job" and would be permanently replaced. One hundred and twenty-six employees who continued to strike after receiving this notice were discharged. The Union submitted a grievance on behalf of these employees, which proceeded to arbitration pursuant to the collective bargaining agreement. The arbitrator found that the strike violated Article X of

the collective bargaining agreement but ruled that the discharge penalty was too severe, and ordered the Company to reinstate all strikers except those who instigated the strike. The Company complied with the award, and reinstated all but twenty employees who were identified as instigators in a subsequent grievance procedure.

The Union filed an unfair labor practice charge against the Company, alleging that the discharges restrained employees in their exercise of protected activity in violation of section 8(a)(1) of the Act. The administrative law judge dismissed the complaint, finding that the employees had waived their right to strike in Article X. The Board disagreed, and held that the no-strike clause in Article X did not waive employees' right to strike over the Fund's failure to pay insurance premiums. The Board examined the collective bargaining agreement and extrinsic evidence and concluded that "the union could not have made a clear and unmistakable waiver of the employees' right to strike to put pressure on the Fund since the parties never foresaw the possibility of such a situation." *Pacemaker Yacht Co.*, 253 N.L.R.B. No. 95, 1980–81 *Labor L.Rep. (CCH)* ¶ 17,733, at 28,579. Consequently, the Board found that the discharges violated section 8(a)(1) and ordered the Company to reinstate the employees with full seniority and backpay. The Company petitioned for review of that order and the Board cross-applied for enforcement.

## II.

The Company urges that the Board's order should not be enforced for three reasons. First, the Company disputes the Board's finding that the no-strike clause in Article X of the collective bargaining agreement did not constitute a waiver of the right to strike over the Fund's failure to pay premiums to the insurance carrier. Second, it argues that the Board erred in failing to defer to the arbitrator's award in accordance with the standards established in *Spielberg Manufacturing Co.*, 112 N.L.R.B. 1080 (1955). Finally, the Company contends that the strike was not protected

activity under section 7 of the Act because the work stoppage involved a matter beyond its control. Because we find the waiver issue dispositive, it is unnecessary to address the Company's other arguments.

## III.

Assuming, without deciding, that the strike at issue was protected activity under section 7 of the Act, we start with the proposition that generally employees may, through the collective bargaining process, waive the right to engage in this protected activity. *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 280, 76 S.Ct. 349, 356, 100 L.Ed. 309 (1956). We have cautioned, however, that such a waiver must be "clear and unmistakable and that explicit language will not be read expansively." *Delaware Coca-Cola Bottling Co. v. General Teamsters Local 326*, 624 F.2d 1182, 1187–88 (3d Cir. 1980).

In *Delaware Coca-Cola*, we held that a single, broad, generally-worded no-strike clause does not constitute a clear and unmistakable waiver of the right of employees to engage in a sympathy strike. 624 F.2d at 1187. Our holding was squarely grounded upon the application of the principle of coterminous interpretation to a single express no-strike clause. Under this rule of contract interpretation, a no-strike clause is presumed to be no broader than the arbitration clause in a collective bargaining agreement. *See Gateway Coal Co. v. United Mine Workers*, 414 U.S. 368, 382, 94 S.Ct. 629, 639, 38 L.Ed.2d 583 (1974). Underlying this presumption is the theory that a no-strike clause is generally a quid pro quo for an arbitration clause. *See Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 455, 77 S.Ct. 912, 917, 1 L.Ed.2d 972 (1957). In *Delaware Coca-Cola*, we were unable to find any extrinsic evidence indicating that the parties had intended the no-strike clause to be broader than the arbitration clause and thus held that since the sympathy strike was not arbitrable, it was not barred by the no-strike clause.

The principle of coterminous interpretation, however, is not a rule of law, but

merely a tool of contract interpretation, *see W–I Canteen Service Inc. v. NLRB*, 606 F.2d 738, 744 (7th Cir. 1979), which "must be applied to the facts of each case," *Delaware Coca-Cola*, 624 F.2d at 1187.

The collective bargaining agreement at issue contained two separate no-strike clauses.

## ARTICLE IX

### GRIEVANCE PROCEDURE

9.1 Should difference arise between the Company and its employees or between the Company and the Union as to the interpretation or application of the provisions of this Agreement, there shall be no suspension or stoppage of work and an earnest effort shall be made to settle such differences immediately or in the manner described below. [grievance procedures follow]

## ARTICLE X

### NO STRIKES OR LOCKOUT

10.1 So long as this Agreement is in effect, the Company agrees that there shall be no lockouts and the Union agrees that there will be no strikes, picketing, slow downs, deliberate curtailment of production, work stoppages of any kind or other interruption of the Company's operations. In the event one or more employees fail to abide by the provisions of this article, the Company retains full right to take any disciplinary action it deems necessary, including discharge.

10.2 In the event that there is any disagreement as to whether or not the employee has participated in such conduct, then this shall be deemed to be a grievance to be settled in accordance with Article IX.

■ The Board acknowledged that "the no-strike clause embodied in Article X is more comprehensive in scope than that in Article IX, and was not given as a quid pro quo for the grievance and arbitration procedure. . . ." *Pacemaker Yacht Co.*, 1980–81 *Labor L.Rep. (CCH)* ¶ 17,733, at 23,580.

Nonetheless, the Board concluded that the "absence of evidence that the parties either considered or discussed whether the no-strike clause would cover the situation which arose here indicates that no clear and unmistakable waiver of the right to strike over the Fund's inaction occurred." *Id.* Even apart from the general rule that courts "owe no particular deference to the Board" on matters of contract interpretation, *Dow Chemical Co. v. NLRB*, 636 F.2d 1352, 1358 (3d Cir. 1980), we believe that the Board erred as a matter of law in concluding that Article X did not bar the strike over the Fund's delinquency.

■ When limited by the principle of coterminous interpretation, a no-strike clause encompasses only arbitrable disputes. Therefore, a claim that the collective bargaining agreement waives the right to strike over a particular nonarbitrable dispute must be established clearly and unmistakably in order to rebut the presumption that the employees' waiver is no greater than the employer's obligation under the arbitration clause. When, however, a no-strike clause is not limited by the arbitration clause, the employer need not introduce evidence that the parties intended the no-strike clause to prohibit precisely the type of strike that actually occurred. All that is required is that a comprehensive waiver extending beyond the arbitration clause be "clear and unmistakable." *See W–I Canteen Service, Inc. v. NLRB*, 606 F.2d 738, 745 (7th Cir. 1979) (rejecting "a rigid requirement that a no-strike clause contain the specific term 'sympathy strike' " to waive employee's right to engage in sympathy strike, where no-strike clause expressly extended beyond arbitration clause).

An examination of the collective bargaining agreement, "read as a whole and in light of the law relating to it when made," *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 279, 76 S.Ct. 349, 356, 100 L.Ed. 309 (1956), establishes such a clear and unmistakable waiver. First, the language of Article X plainly prohibits all "strikes, picketing . . . or other interruption of the Company's operations." It is apparent that the

no-strike pledge in Article X was given in exchange for the Company's no-lockout pledge. It is also clear that the parties intended Article IX to bar strikes over arbitrable disputes and Article X to bar strikes over all other disputes. There is no reason not to give this language its "ordinary and reasonable meaning." *Penn Packing Co. v. Amalgamated Meat Cutters, Local 195*, 497 F.2d 888, 891 (3d Cir. 1974). Indeed, a contrary interpretation would seem to render the no-strike clause in Article X a nullity. Since the no-strike clause in Article IX alone bars strikes over arbitrable disputes, Article X must be construed to bar nonarbitrable disputes—including unforeseeable disputes. We reject the Board's interpretation in favor of the "settled rule of contract interpretation that contract language should not be interpreted to render the contract promise illusory or meaningless." *Retail Clerks Local 455 v. NLRB*, 510 F.2d 802, 806 n.15 (D.C.Cir. 1975).

Extrinsic evidence provides additional support for our interpretation of the no-strike clause. Recognizing the "danger inherent in utilizing [evidence about the conduct of the parties at the time of the strike] because it may not reflect the parties' intention at the time of the execution of the contract," *Delaware Coca-Cola*, 624 F.2d at 1189, we note that the Union officials consistently advised employees that their action violated the no-strike clause in the collective bargaining agreement. The Union also apparently conceded this point before the arbitrator. Unlike the ambiguous extrinsic evidence considered in *Delaware Coca-Cola*, 624 F.2d at 1189-90, the statements of Union officials here, who had signed the collective bargaining agreement, leave little doubt that they regarded the strike as a violation of the collective bargaining agreement.

■ Although the Union's statements must be considered in light of the fact that the strike resulted from employee dissatisfaction over the Union's administration of the Fund, we believe they are entitled to some probative value. *Cf. Iowa Beef Processors v. Amalgamated Meat Cutters*, 597 F.2d 1138, 1144 (8th Cir.), *cert. denied*, 444 U.S. 840, 100 S.Ct. 79, 62 L.Ed.2d 52 (1979) (finding statements by union officials that strike violated no-strike clause probative of contractual intent where agreement required union to declare all strikes unauthorized).

Finally, the state of the law at the time the agreement was executed supports the inference that by including two separate no-strike clauses the parties intended to bar strikes over both arbitrable and nonarbitrable disputes. At the time the contract was negotiated, the principle of coterminous interpretation had been adopted by the Board and by at least one court. *See Gary Hobart Water Corp. v. NLRB*, 210 N.L.R.B. 742 (1974), *enforced*, 511 F.2d 284, 288 (7th Cir.), *cert. denied*, 423 U.S. 925 (1975).[1] From this we infer that the inclusion of two no-strike clauses, one expressly tied to the arbitration clause and one prohibiting all strikes, was intended to waive the employees' right to strike over unforeseeable disputes, including the dispute over the Fund's failure to pay insurance premiums.

The Board apparently seeks to engraft a new limitation on the well-established ability of employees to waive their right to strike. Implicit in the Board's opinion is the notion that a general no-strike clause

---

1. We do not view our decision today as inconsistent with subsequent Board decisions construing waiver provisions in collective bargaining agreements. In *International Union of Operating Engineers (Davis-McKee)*, 238 N.L.R.B. 652 (1978), the Board held that a broad no-strike clause did not ban sympathy strikes. In that decision, however, the Board relied on the "presumption ... that when the union gives up the right to strike in return for the employer's obligation to submit disputes to arbitration, it does so only with respect to those disputes which are arbitrable." *Id.* at 654. No such presumption is warranted here. This case resembles *American Cyanamid Co.*, 246 N.L.R.B. No. 17, 1979-80 *NLRB Dec. (CCH)* ¶ 16,354 in which the Board found that the existence of two separate no-strike clauses "suggests that ... the broad, no-strike provisions in the 'Strikes and Lockouts' article were not the quid pro quo for [the Union's] agreement to arbitrate disputes, but were an independent undertaking by the Union in return for Respondent's no-lockout pledge." *Id.* at 30,600.

may never waive the right to strike over unspecified, nonarbitrable disputes. Although some may read our decision in *Delaware Coca-Cola* this broadly, *see* Note, *Express No-Strike Clause Agreements*, 67 *Va. L.Rev.* 729, 746 n.82 (1981), we decline to do so. The practical consequence of the Board's position is apparent here. Because a strike over the Fund's delinquency was unforeseeable at the time of the contract negotiations, under the Board's view, employees would have been incapable of waiving the right to strike over this dispute at all. We believe there is no basis for limiting employees' ability to waive the right to strike over nonarbitrable disputes simply because they were unforeseeable at the time the contract was negotiated. *Cf. United Steelworkers of America v. Warrior and Gulf Navigation Co.*, 363 U.S. 574, 578–80, 80 S.Ct. 1347, 1350–51, 4 L.Ed.2d 1409 (1960) (a collective bargaining agreement "is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate.").

█ Freedom of contract is the "fundamental premise" on which the National Labor Relations Act is based. *H.K. Porter Co. v. NLRB*, 397 U.S. 99, 108, 90 S.Ct. 821, 826, 25 L.Ed.2d 146 (1970). Absent a contractual provision in irreconcilable conflict with federal labor policy, neither courts nor the Board may modify or nullify substantive contractual provisions. *See Armco Steel Corp. v. NLRB*, 344 F.2d 621, 624–25 (6th Cir. 1965).[2] The waiver of the right to strike over the dispute at issue here violates no principle of labor law and indeed may encourage industrial peace. *See Mastro Plastics Co. v. NLRB*, 350 U.S. 270, 280, 76 S.Ct. 349, 356, 100 L.Ed. 309 (1956) ("[w]aivers [of the right to strike] contribute to the normal flow of commerce and to the maintenance of regular production schedules."). Moreover, to require specific enumeration

in a no-strike clause of all possible nonarbitrable disputes that might result in a work stoppage would place an unjustified obstacle on the ability of employers to bargain for an across-the-board no-strike clause and on the employees' ability to gain concessions in return for such a pledge. An employer who bargains for such a clause would never be certain that employees would not strike over some unforeseeable dispute, and employees, in turn, would have less to offer during contract negotiations. No federal labor policy supports such a restriction on party autonomy in the collective bargaining process.

We thus hold that the general no-strike clause in Article X of the collective bargaining agreement, not limited by the arbitration clause, constitutes a waiver of the employees' right to strike over the Fund's failure to pay insurance premiums.

IV.

The Company's petition for review will be granted and the Board's cross-application for enforcement will be denied.

GARTH, Circuit Judge, concurring.

I am in complete agreement with Chief Judge Seitz's analysis and his conclusion that the broadly worded no-strike clause in Article X of the collective bargaining agreement constituted a waiver of the employees' right to strike in the circumstances of this case. I would not rest our decision on the resolution of the waiver issue, however, but would meet head-on the question the majority finds unnecessary to address: whether, in the first place, the strike was protected activity under section 7 of the Act. In this regard, I would hold that the use of economic weapons, such as a strike, against an employer is not protected under section 7 when the object of the employees' grievance is a matter beyond the employer's

---

2. We are not confronted here with an asserted waiver of the right to strike over an employer's unfair labor practices. *Cf. Mastro Plastics Co. v. NLRB*, 350 U.S. 270, 76 S.Ct. 346, 100 L.Ed. 309 (1956) (finding strong policy against unfair labor practices and the right of employees to select their own bargaining representatives pre-

cludes implied waiver of right to strike over unfair labor practices). We also note that in this case the employer does not seek to enjoin a strike under § 301(a) of the Labor Management Relations Act, 29 U.S.C. § 184 (1976). *See Buffalo Forge Co. v. United Steelworkers*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976).

control or the employer's power to influence.

## I.

Pacemaker in this case found itself caught in the crossfire between its employees and their union. The company had fulfilled its contractual responsibility of making contributions to the union's health and welfare fund, but the Fund—over which Pacemaker had no control—had failed to pay premiums to the Fund's insurance carrier, Republic National Life Insurance Co. As a result, Republic refused to pay the medical and hospital claims of employee beneficiaries.

The record discloses that the Fund, the Teamsters Health and Welfare Fund of Philadelphia and Vicinity—Local 158, was, practically speaking, twice removed from Pacemaker. Under its agreement with the union, Pacemaker, for each hour worked by each of its employees, paid forty cents to the Fund, which was an entity separate from the company and the union. It is conceded that Pacemaker at all times faithfully complied with this obligation. The Fund was responsible for selecting the insurance carrier and for paying the premiums for continued medical and hospital coverage of the employees. Thus, when the Fund failed to pay those premiums and Republic thereupon discontinued making benefit payments to the employees, Pacemaker was powerless to remedy the problem. The situation was well described by the union's lawyer, who told the Board's administrative law judge:

> The private insurance carrier stopped making payments to the employees, quite frankly, for failure on the part of the fund to make contributions to the private insurance carrier. Their position was that if we don't receive any money, we are not going to pay benefits.
>
> This caused a problem with the employees because the employees started getting contacts from various doctors and hospitals that the bills were not getting paid. The employees went to the union to try to resolve the problem. The union tried

to make its best efforts to resolve the problem. Obviously, if the fund itself being a separate entity was not able to make the payments, then the union could not really do too much for the employees. App. at 301a–302a. Clearly, if the union could not bring the situation under control, Pacemaker, which was still another step removed from the Fund, could not.

It was in this context that the employees became restive. As their dissatisfaction with the administration of the Fund grew, the company sought to have the union resolve the Fund's problems, but these endeavors were unsuccessful. When no signs of progress were forthcoming, Pacemaker's employees, in an attempt to put pressure on the union to remedy the Fund's delinquency, struck *Pacemaker* and demonstrated outside one of Pacemaker's plants as well as the union's headquarters. The strike—which, as we hold today, violated the no-strike clause of the collective bargaining agreement—forced the company temporarily to close both of its plants.

Thus, the record shows that the employees struck the company even though their grievance was not with Pacemaker, but was with the Fund. They inflicted a grave economic wound on their financially shaky employer (the company subsequently initiated Chapter XI bankruptcy proceedings) despite the fact that Pacemaker had no power to give them the relief they demanded and could not even influence the entity which did have that power.

## II.

Section 7 of the Act provides that "[e]mployees shall have the right . . . to engage in . . . concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." 29 U.S.C. § 157 (1976). However, employee activities aimed at improving terms and conditions of employment can lose their section 7 protection if carried out in a disruptive or otherwise inappropriate manner. *See Emporium Capwell Co. v. Western Addition Community Org.*, 420 U.S. 50, 95 S.Ct. 977, 43 L.Ed.2d 12 (1975) (separate bargaining by minority

group of employees would undermine principle of collective bargaining); *NLRB v. Local Union No. 1229, IBEW (Jefferson Standard )*, 346 U.S. 464, 477–78, 74 S.Ct. 172, 179, 98 L.Ed. 195 (1953) (disloyal employees distributed leaflets disparaging quality of employer's product; "the means used by the [employees] . . . have deprived [them] of the protection of [section 7]"); *Sullair P.T.O., Inc. v. NLRB*, 641 F.2d 500 (7th Cir. 1981) (employee's obscene language and disruptive behavior unprotected); *Texas Instruments, Inc. v. NLRB*, 637 F.2d 822 (1st Cir. 1981) (employees disseminated confidential wage information); *National Vendors v. NLRB*, 630 F.2d 1265, 1268 (8th Cir. 1980) (employees conducted disruptive meeting in company cafeteria); *Abilities & Goodwill, Inc. v. NLRB*, 612 F.2d 6, 9 (1st Cir. 1979) (employees struck over firing of high-ranking management official); *Texaco, Inc. v. NLRB*, 462 F.2d 812 (3d Cir.) (deliberately or maliciously false employee statements unprotected), *cert. denied*, 409 U.S. 1008, 93 S.Ct. 442, 34 L.Ed.2d 302 (1972). *See generally NLRB v. Pincus Bros., Inc.—Maxwell*, 620 F.2d 367, 375–77 (3d Cir. 1980) (employee circulated leaflet disparaging employer).

"[T]he general rule adopted by the courts has been to look at a variety of factors, including the reasonableness of the means of protest, in order to determine if the employees' activities were protected." *Abilities & Goodwill, supra*, 612 F.2d at 9. As the court stated in *Texas Instruments, supra*, 637 F.2d at 830, "Not all conduct that can, in some general sense, be characterized as an exercise of a right enumerated in section 7 is afforded the protection of the Act. . . . [R]ights under section 7 must in each instance be understood in relation to the concrete facts of a particular case" (citations omitted).

The argument for denying employee actions protected status is even stronger when the actions of employees unnecessarily and unfairly inflict economic harm on an employer who is neither responsible for the complained-of condition nor has any power to correct it. *See NLRB v. Bretz Fuel Co.*, 210 F.2d 392, 397 (4th Cir. 1954). As one

commentator has written, "The argument that economic pressure should be unprotected [where the employer lacks interest or control] is . . . convincing." Getman, *The Protection of Economic Pressure by Section 7 of the National Labor Relations Act*, 115 U.Pa.L.Rev. 1195, 1221 (1967).

This observation is directly applicable to this case. Here Pacemaker's employees used the company as a pawn in a crisis not of the company's making and beyond its power to resolve. The company had to endure total disruption of its production processes even though the dispute that triggered the strike was entirely between the employees and the Fund. *Cf. Harnischfeger Corp. v. NLRB*, 207 F.2d 575 (7th Cir. 1953). As Professor Getman has argued, "Where . . . the employer is not a party to the controversy . . . there is no reason why he should be forced to permit his business to be used as a battleground." Getman, *supra*, at 1221.

The teaching of *Eastex, Inc. v. NLRB*, 437 U.S. 556, 98 S.Ct. 2505, 57 L.Ed.2d 428 (1978), a case cited by both parties, is not to the contrary. In *Eastex*, the most recent Supreme Court expression concerning protected activity, the Court held that an employer could not prohibit the distribution, in nonworking areas of the employer's property during nonworking time, of a union newsletter that, in part, urged employees to lobby against incorporation of "right-to-work" provisions into the state constitution and criticized a presidential veto of an increase in the federal minimum wage. The employees in *Eastex* did not strike the company. Rather, they filed an unfair labor practice charge against Eastex seeking the right to distribute the newsletter.

Eastex argued that the distribution of the newsletter did not come within the "mutual aid or protection" language of section 7 because the newsletter did not relate to a specific dispute between the employees and their own employer over an issue which the employer had the right or power to affect. *Id.* at 563, 98 S.Ct. at 2511. The Court rejected the employer's argument,

finding "no warrant for [the company's] view that employees lose their protection under the 'mutual aid or protection' clause when they seek to improve terms and conditions of employment or otherwise improve their lot as employees through channels outside the immediate employee-employer relationship." *Id.* at 565, 98 S.Ct. at 2512. The Court observed that the subjects addressed in the newsletter could have a significant impact on the union's strength at the bargaining table and on the level of wages negotiated with the employer. *Id.* at 569, 98 S.Ct. at 2514.

It was in this special context, however, where half the newsletter's contents were clearly protected and where no strike occurred, that the Court rejected Eastex's "lack of control" argument. In doing so, the Court took pains to stress the limited nature of its holding. The Court observed, for example, that "the employer ha[d] not attempted to show that distribution [of the newsletter] would interfere with plant discipline or production." *Id.* at 572, 98 S.Ct. at 2515. More significantly, however, the Court acknowledged that "even when concerted activity comes within the scope of the 'mutual aid or protection' clause, the forms such activity permissibly may take may well depend on the object of the activity," and proceeded to quote from Professor Getman's article. *Id.* at 568 n.18, 98 S.Ct. at 2513 n.18. Thus, while *Eastex* bears upon the subject of protected activity and recognizes that protection may vary with the form and object of the activity, *Eastex* is not this case.

The form the employee activity took in this case makes the situation with which we are confronted totally different from the circumstances before the Court in *Eastex.* Although here, as in *Eastex,* the source of employee dissatisfaction lay in matters beyond the employer's control, unlike *Eastex,* the means used to express the employee grievances in the instant case had a substantially greater negative impact on the innocent employer. Moreover, while in *Eastex,* the employer could not show how it was prejudiced by the mere distribution of a protected newsletter in nonworking areas during nonworking time, the employer here was forced by the unwarranted actions of its employees to close both its plants, thereby shutting down production.

### III.

I would thus hold that on the facts of this case, where the company concededly fulfilled all its responsibilities with respect to its collective bargaining agreement and the health and welfare fund, and the employees' grievance was solely with the Fund, the employees' strike against the company which employed them, did not constitute protected activity within the meaning of section 7 of the Act. This being the case, I would not reach the waiver issue discussed by the majority, with whose reasoning I, in any event, agree.