INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, UAW

v.

MACK TRUCKS, INC.

Civ. A. No. 85–7417.

United States District Court, E.D. Pennsylvania.

Feb. 8, 1990.

Richard Markowitz, Philadelphia, Pa., for plaintiff.

Edward T. Ellis, Philadelphia, Pa., for defendant.

## FINDINGS OF FACT, DISCUSSION, CONCLUSIONS OF LAW, AND ORDER

HUYETT, District Judge.

Plaintiff International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW" or "the Union") brought this equitable action under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. The Union seeks a permanent injunction to prevent defendant Mack Trucks, Inc. ("Mack" or "the Company") from changing the health insurance carrier that provides coverage for its employees without the mutual consent of the Union.

## I. INTRODUCTION

The UAW filed this complaint along with a motion for a preliminary injunction on December 26, 1985. It sought to enjoin Mack from implementing a proposed change from health insurance coverage with Blue Cross/Blue Shield to Equitable Life Assurance Society ("Equitable") [1]. The UAW contended that, under the terms of the collective bargaining agreement between the parties, Mack could not change its health insurance carrier without the Union's consent.

After negotiation, the Union withdrew its motion for a preliminary injunction, and the parties agreed to exchange information and to meet to discuss the planned shift to Equitable. The UAW sought to submit the dispute to binding arbitration, but Mack contended that the dispute was not subject to arbitration under the collective bargaining agreement.

After further negotiations, it appeared that the parties could not resolve their differences. This action thus proceeded to a non-jury trial on the issue of whether the UAW was entitled to a permanent injunction. After the UAW rested its case and Mack moved for a directed verdict pursuant to Rule 50(a) of the Federal Rules of Civil Procedure, I granted Mack's motion in a ruling from the bench.

Later, I issued Findings of Fact, Discussion, and Conclusions of Law which set forth in more detail my reasoning for granting the directed verdict in favor of Mack. Based only on evidence submitted by the UAW, I concluded that Mack breached the collective bargaining agreement by changing its health insurance carrier from Blue Cross/Blue Shield to Equitable without the consent of the UAW. Nonetheless, I concluded that the UAW failed to demonstrate that its members were harmed by Mack's technical violation of the contract and, considering the equities, the UAW was not entitled to a permanent injunction.

The UAW appealed, and, in an opinion dated June 5, 1987, the Third Circuit Court of Appeals held that the UAW was harmed because it had lost a bargaining chip, which could have been traded for other benefits from Mack. *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW v.*

---

1. Equitable Life Assurance Company is now called Equicor. *See* 1989 Trial Transcript at 28.

*Mack Trucks, Inc.*, 820 F.2d 91, 95 (3d Cir.1987). Therefore, the court concluded that the Union had established sufficient evidence of harm to make out a prima facie case necessary for a permanent injunction and, thus, that I erred in directing a verdict against the Union and in favor of the Company. *Id.* at 98. In remanding the case for further proceedings, the court stated that "we will not (as the UAW requests) order the district court presently to grant that [equitable] relief, since the directed verdict precluded Mack from introducing evidence to counter the Union's case." *Id.* at 98.

On October 4, 1989, Mack presented its case to this court with four witnesses. In rebuttal, the UAW presented one witness, Jack Derry, an International Representative of the UAW.

Upon consideration of all the evidence, as well as the parties' pre-trial submissions and post-trial submissions, I now conclude that Mack did *not* breach the collective bargaining agreement by changing its health insurance carrier from Blue Cross/Blue Shield to Equitable without the consent of the UAW. What follows are my findings of fact, discussion, and conclusions of law in support of this conclusion.

## II. FINDINGS OF FACT

### A. Background and Parties

1. Plaintiff, the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America, UAW, is an unincorporated association, commonly known as a labor union, with offices located at 8000 East Jefferson Avenue, Detroit, Michigan. The UAW is a labor organization representing employees in an industry affecting commerce within the meaning of Section 2(5) of the National Labor Relations Act, as amended, 29 U.S.C. § 152(5). [Stipulation No. 1].

2. Defendant, Mack Trucks, Inc., is a Pennsylvania corporation with offices located at 2100 Mack Boulevard, Allentown, Pennsylvania. Mack is an employer engaged in an industry affecting commerce within the meaning of section 2(2) of the National Labor Relations Act, as amended, 29 U.S.C. § 152(2). [Stipulation No. 2].

3. At the time this lawsuit was filed, Mack and the UAW were parties to a master collective bargaining agreement and several local collective bargaining agreements which covered the terms and conditions of employment for certain employees of Mack. The master agreement in effect when this lawsuit was filed was by its terms effective from October 30, 1984 to May 4, 1987. [Stipulation No. 3].

4. The life, disability, and health insurance program in effect for the UAW employees under the 1984 Master Agreement are set forth in Appendix B of the Master Agreement [Defendant's Exhibit 2], as modified by the documents negotiated and agreed to by the Union and Mack and signed on November 7, 1984. [Defendant's Exhibit 6].

5. On May 4, 1987, the 1987 Master Agreement superseded the 1984 Master Agreement. The provisions of the 1984 Master Agreement that apply to this lawsuit are unchanged in the 1987 Master Agreement. The 1987 Master Agreement is by its terms effective until October 27, 1992. [Stipulation No. 3].

6. The Appendix B life, health, and disability insurance program covers approximately 6,900 active employees and their families and approximately 3,300 retirees or surviving spouses of Mack retirees. [Stipulation No. 6].

7. Prior to the 1984 Master Agreement, Appendix B of the Master Agreement contained two provisions that restricted Mack's right to select the insurance carrier for its health benefits program. First, Article I, section 2 provided that the Company would "continue in force for the duration of this Program its present group insurance contracts and Blue Cross/Blue Shield contracts." [Plaintiff's Exhibit 2, p. 121]. Second, Article III, sections 1, 2, and 3 provided that the parties could, by mutual agreement, substitute specific benefit plans of other organizations providing the same benefits as those provided by Blue Cross/Blue Shield. [Plaintiff's Exhibit 2,

pp. 151, 152, & 153–154; *see also* Stipulation No. 5].

### B. Employee Benefit Terminology

8. A "provider," in the nomenclature of employee benefits and health care, is a medical practitioner, like a physician, or an organization, like a hospital, that delivers medical treatment or care. [1989 Trial Transcript at 12].

9. A "carrier," in the nomenclature of employee benefits and health care, is an organization that an employer works with to either administer or both administer and insure a health benefits plan for employees. [1989 Trial Transcript at 11]. Typically, a carrier is a commercial insurance company. [1989 Trial Transcript at 11]. Blue Cross/Blue Shield and the Equitable are examples of carriers. [1989 Trial Transcript at 68].

10. A "fee-for-service plan" or "traditional plan," in the nomenclature of employee benefits and health care, is an indemnity type of medical plan in which the carrier pays fees either to providers who have rendered services to covered beneficiaries or to beneficiaries who have already paid the provider for services covered under the plan. Under a fee-for-service plan, an employee or other beneficiary is free to choose his or her own health care provider. [1989 Trial Transcript at 12].

11. An "alternate delivery system," in the nomenclature of employee benefits and health care, is a managed health care plan that delivers cost-effective health care by restricting the freedom of the employee or other beneficiary to select his or her own health care provider and also by controlling access to health care by utilization of review, second opinions, and similar means. [1989 Trial Transcript at 13–14]. A health maintenance organization ("HMO") and a preferred provider organization ("PPO") are examples of alternative delivery systems. [1989 Trial Transcript at 13].

12. The terms "carrier" and "delivery system" are *not* synonyms and are *not* used interchangeably in the employee benefits and health care field. [1989 Trial Transcript at 14–15). However, it is customary practice for a carrier to establish or sponsor an alternative deliver system, either at a specific client's request or on a speculative basis in order to attract customers and sell insurance products. [1989 Trial Transcript at 15].

### C. The 1984 Mack–UAW Master Agreement Negotiations

13. In 1984, Mack undertook an evaluation of its health insurance programs as the result of significant increases in the costs that it had been experiencing under its health benefits administration contract with Blue Cross/Blue Shield. [1989 Trial Transcript at 70–72]. Mack retained the consulting firm of Deloitte, Haskins & Sells to assist in its evaluation and to provide it with recommendations on how to deliver health care benefits on a more cost effective basis. [1989 Trial Transcript at 17; Defendant's Exhibit 7].

14. In late August or early September of 1984, the Company met with Deloitte, Haskins & Sells to discuss recommendations with respect to Mack's health benefits plan. [1989 Trial Transcript at 19–20]. Deloitte, Haskins & Sells made recommendations in four general categories. In the area of administration and funding, the consulting firm recommended that Mack convert to a self-insured arrangement and competitively bid for the services of an insurance carrier to administer its health benefits plan. [1989 Trial Transcript at 18].

15. After this meeting with Deloitte, Haskins & Sells, the Company decided that one of its main goals during the upcoming negotiations was to secure the right to make a unilateral change in carriers. [1989 Trial Transcript at 22–23].

16. In negotiations that began in September 1984 and ended in November 1984, Mack and the UAW agreed on Appendix B of the 1984 Master Agreement. During negotiations, the parties delegated the work on Appendix B and related letter agreements to a Joint Subcommittee on Benefits, which met numerous times during the negotiations. [1989 Trial Tran-

script at 65; Stipulation No. 8]. The chief spokesperson for Mack on the Joint Subcommittee on Benefits was William J. Gmitter; the chief spokesperson for the UAW was John Collins, a staff employee of the International Union. [1989 Trial Transcript at 65–66]. Manfred Bittkau, a UAW benefits specialist, participated in the negotiations to assist Collins. [1989 Trial Transcript at 94]. Mr. Bittkau has more than 30 years of experience in employee benefits and is sophisticated and well-versed in the area. [1986 Trial Transcript at 1.136–1.-138].

17. During the 1984 negotiations, Mack presented to the UAW the need to contain the costs of the health benefits offered to its employees, dependents and retirees. [1986 Trial Transcript at 1.7 & 1.108]. The Company suggested alternative cost-efficient methods for delivering health benefits, specifically the establishment of a preferred provider organization (PPO) in the areas in which Mack's employees were so numerous as to constitute a significant market factor. [Defendant's Exhibit 4]. The Company wanted the UAW to agree to allow it to offer alternative delivery systems in addition to the fee-for-service system, which was the system currently in place and offered through Blue Cross/Blue Shield. [1989 Trial Transcript at 90]. The Company did not desire to replace the fee-for-service system, but merely desired to offer alternative systems that would be optional with its employees. [1989 Trial Transcript at 90].

18. The Union's response to the Company's idea of offering alternative delivery systems was generally that the Union was not so much concerned with how and through what organization(s) the Company arranged for health benefits. Rather, the Union was primarily concerned with the terms and conditions of coverage that would relate to the benefits of the insurance coverage, regardless of the delivery system through which the insurance coverage was offered. [1986 Trial Transcript at 1.8]. Ultimately, the Union desired to include in one place in the Collective Bargaining Agreement all of the terms and conditions that would relate to the benefits of the insurance coverage. [1986 Trial Transcript at 1.8]. After that was accomplished the Union stated that it would have no problem with granting the Company sole discretion in deciding through which organizations to secure insurance coverage as well as the types of delivery systems to offer. [1986 Trial Transcript at 1.8].

19. Prior to and during the negotiations for the 1984 Master Agreement, officers and employees of the UAW expressed to Company representatives dissatisfaction with the quality of service being provided by Blue Cross/Blue Shield. [Stipulation No. 7]. Therefore, Jack Derry, a representative of the International Union, requested the Company to remove language in Appendix B requiring the Company to contract with Blue Cross/Blue Shield. [1989 Trial Transcript at 77]. The Company's response to this request was favorable because the Company did not want to be bound by the collective bargaining agreement to one particular organization or one particular system of delivering health benefits. [1989 Trial Transcript at 77–78].

20. Both the Company and the Union submitted proposals to replace the language in the 1980 Master Agreement that required the Company to contract exclusively with Blue Cross/Blue Shield. The Union submitted a Letter of Understanding. [Defendant's Exhibit 5(c), p. 10]. The Company submitted a document entitled "Language to Remove Reference to Insurance Carriers," dated October 19, 1984. [Plaintiff's Exhibit 3].

21. During one of the meetings of the Joint Subcommittee on Benefits, Mr. Gmitter asked Mr. Collins whether it would be necessary for the Union to ratify a change in carriers. [1989 Trial Transcript at 82]. Mr. Collins told Mr. Gmitter that a change in carriers would not require ratification by the membership of the UAW. [1989 Trial Transcript at 82–83].

22. On October 19, 1984, the Joint Subcommittee on Benefits met and discussed the proposals submitted by the parties. The result of the negotiations at that meeting was a merger of the two documents.

[1989 Trial Transcript at 81; Defendant's Exhibit 5(c), pp. 9–10].

23. On October 20, 1984, the Union went on strike[2]. [1989 Trial Transcript at 67 & 81]. During the strike, the Company and the Union did not continue negotiating the language of Article I, section 2 of Appendix B. [1989 Trial Transcript at 81–82].

24. On November 1, 1984, immediately following the settlement of the strike and approval of the main body of the 1984 Master Collective Bargaining Agreement, the Company and the Union met to continue negotiating the language contained in Article I, section 2 of Appendix B. [1989 Trial Transcript at 83]. By virtue of those negotiations, the document marked Defendant's Exhibit 25 resulted, which is the merger of the proposals submitted by the parties prior to the strike and discussed at the meeting on October 19, 1984, along with three changes of terminology made at the meeting on November 1, 1984. [Defendant's Exhibit 5(c), pp. 9–10; Defendant's Exhibit 25; 1989 Trial Transcript at 86].

25. Present at the meeting on November 1, 1984 of the Joint Subcommittee on Benefits were Mr. Gmitter and Ms. Andrews, representing the Company, and Mr. Bittkau and Mr. Derry, representing the Union. During this meeting, the parties agreed to three (3) changes in terminology in the second paragraph of Defendant's Exhibit 25.

Mr. Gmitter requested that the term "provider" in the tenth line of the second paragraph be stricken because he thought that the inclusion of that word could be interpreted as requiring the Company to continue with the same participating network of physicians and hospitals. [1989 Trial Transcript at 86–87]. Mr. Gmitter stated to Mr. Bittkau that, if the Company were required to maintain the participating network of physicians and hospitals, the Company would never be able to change insurance carriers without the approval of the UAW. [1989 Trial Transcript at 87; see Findings of Fact, No. 21 (Mr. Collins, Chief Union Spokesperson, had previously told Mr. Gmitter, Chief Company Spokesperson, that the Company would not be required to have a change in carriers ratified by the UAW membership.)]. Mr. Bittkau agreed with Mr. Gmitter that the inclusion of the word "provider" in the tenth line of the second paragraph was confusing and, therefore, should be stricken.

Then Mr. Bittkau suggested that the term "provider" be replaced with the word "carrier." Ms. Andrews scratched out the word "provider" and wrote in above it the word "carrier." In response to that suggestion, Mr. Gmitter stated that the same problem existed with the word "carrier" as existed with the word "provider." Mr. Gmitter said "it's almost like saying that the current Blue Cross/Blue Shield arrangement with Blue Cross/Blue Shield will continue." [1989 Trial Transcript at 88].

Mr. Gmitter then suggested to Mr. Bittkau that they strike "carrier" and simply say "the current arrangement with Blue Cross/Blue Shield." [1989 Trial Transcript at 88]. Mr. Bittkau agreed to this suggestion. Mr. Gmitter understood the phrase "current arrangement with Blue Cross/Blue Shield" to mean the current fee-for-service system that Mack had with Blue Cross/Blue Shield at that time. [1989 Trial Transcript at 89].

For the same reasons that he suggested scratching the term "provider" in the tenth line of the second paragraph, Mr. Gmitter also suggested scratching the term "provider" in the thirteenth and fifteenth lines of the same paragraph. In the thirteenth and fifteenth lines, the word "provider" was replaced with the words "delivery system." The parties replaced the term "provider" with the term "delivery system" in order to permit the Company the option of changing insurance carriers without the Union's consent, as long as the terms and conditions of coverage remained un-

---

**2.** It is not clear from the record why the Union went on strike on October 20, 1984. It does appear, however, that the strike was *not* related to the negotiations with respect to Article 1, section 2 of Appendix B of the 1984 Master Agreement—the contract language at issue in this action.

changed. The inclusion of the term "delivery system" also prevented the Company from offering its employees alternative delivery systems, such as HMOs or PPOs, without the mutual agreement of the Union. [1989 Trial Transcript at 90].

26. On November 7, 1989, representatives of the Company and the Union met again to approve and adopt the final version of the contract language that would replace the second paragraph of Article I, section 2 of Appendix B of the 1980 Master Agreement. For the Union, Mr. Bittkau and Mr. Derry initialed and dated both pages of the final version of the contract language.[3] For the Company, Mr. Gmitter initialed and dated both pages. [Defendant's Exhibit 6, p. 8].

27. The final version of the second paragraph of Article I, Section 2 of Appendix B of the 1984 Master Collective Bargaining Agreement, as approved in final form by the parties on November 7, 1984, reads as follows:

The Company shall arrange for group insurance coverage as here and after provided.

Such coverage shall be arranged at the Company's sole discretion, in any manner or through any organization, including, but not limited to, a program or programs provided by an insurance carrier; by arrangement with a hospital plan corporation, professional health service corporation, or similar plan or organization; through a health maintenance organization or similar plan or organization; through a preferred provider arrangement; through a self-insured plan; or through a combination of any or such methods. The terms and conditions of coverage, including those amendments made in these negotiations, are continued on the assumption that the current arrangement with Blue Cross/Blue Shield will continue for the term of the labor agreement. The Company shall not exercise its option to select an alternate delivery system until the parties have reached mutual agreement on the terms and conditions including restrictions, limitations and definitions that would be applicable to any delivery system other than Blue Cross/Blue Shield.

The benefits provided under this Agreement,* including the terms and conditions of coverage, the rules for initial eligibility, continuation of coverage and other general conditions (including definitions and limitations) of coverage as amended from time to time pursuant to the mutual agreement of the parties, shall remain in effect during the term of this Agreement and shall not be altered by the provisions of any agreement between the Company and any benefit program provider. If there is a conflict between the language of this Agreement and that of any agreement between the Company and any benefit program provider, the language of this Agreement shall control.

* The benefits coverage in effect on the date of execution of this Agreement, including the terms and conditions of coverage, the rules of initial eligibility, continuance of coverage, and other general conditions of coverage contained in Appendix B and Publication Form 5551–360–0012 (Revised March 1, 1980[;] except where there is a conflict between that Publication and those terms and conditions previously negotiated by the par-

**3.** Plaintiff contends the Union supplied this court with a copy of this document that did not contain Mr. Bittkau's initials in an effort to disclaim responsibility for the changes to which Mr. Bittkau agreed at the meeting on November 1, 1984. *See* Defendant's Post–Trial Brief at 9–10. *Compare* Plaintiff's Exhibit No. 4 *with* Defendant's Exhibit No. 26.

Although the Union did not offer any explanation as to why Mr. Bittkau's initials are not present on Plaintiff's Exhibit No. 4, the Union does not deny that Mr. Bittkau was present at the meeting on November 1, 1984 when the parties agreed to a change in terminology from "provider" to "delivery system." *See* Plaintiff's Post–Trial Brief at 22–24. Nor does the Union contend that Mr. Bittkau was not present at the meeting on November 7, 1984 when the parties formally approved and adopted the language. *Id.*

Therefore, because the relevant material facts pertaining to the meeting on November 1, 1984 are not in dispute, I do not have to decide whether the Union supplied me with evidence which has been intentionally altered or the inference to be drawn from such evidence.

ties and set forth in an Appendix B[,] those negotiated terms shall control to the extent necessary to resolve the conflict.)

[Defendant's Exhibit 6, p. 8; Defendant's Exhibit 25].

28. The result of the negotiations described above is a contract (1) that requires the Company to continue the terms and conditions of coverage, as specified in Appendix B, and to deliver those benefits on the traditional or fee-for-service basis, (2) that provides the Company with the option of selecting an alternative delivery system for providing health care benefits, such as an HMO or a PPO, but only after the Company and the Union have reached mutual agreement on the terms and conditions that would be applicable to any alternative delivery system, and (3) that provides the Company with the sole discretion of selecting the organization through which its health care benefits are delivered.

*D. The Change From Blue Cross/Blue Shield to Equitable*

29. Effective January 1, 1986, Mack replaced Blue Cross/Blue Shield with Equitable as the carrier for the contractually mandated life, disability, and health benefits.[4] [Stipulation No. 26].

30. Equitable delivers health benefits on the same fee-for-service basis as did Blue Cross/Blue Shield.

31. Mack has stipulated that the terms and conditions of coverage under Equitable are identical to the terms and conditions of coverage under Blue Cross/Blue Shield. [1986 Trial Transcript at 2.30–2.31].

32. The administration of the health benefits plan has been more efficient under Equitable than it was under Blue Cross/Blue Shield. [1989 Trial Transcript at 35].

33. A rollback from Equitable to Blue Cross/Blue Shield would take approximately 90–180 days. In addition, it would cost the Company, conservatively speaking, approximately $750,000 more per year to go back to Blue Cross/Blue Shield. [1989 Trial Transcript at 31 & 36].

34. Equitable has administered Mack's health benefits plan at a savings of approximately $750,000 per year, without any reduction in the benefits offered to individuals covered under the plan. [1989 Trial Transcript at 35–36].

## III. DISCUSSION

To determine whether the Union is entitled to the permanent injunction that it seeks, I must first decide whether the Union has succeeded on the merits of its claim that the Company breached the 1984 Master Bargaining Agreement by switching insurance carriers without the Union's approval. *Philadelphia Welfare Rights Organization v. O'Bannon*, 525 F.Supp. 1055, 1057 (E.D.Pa.1981). Therefore, the crux of this case is the interpretation of the second paragraph of Article I, section 2 of Appendix B of the 1984 Master Collective Bargaining Agreement. *See* Defendant's Exhibit 26.

Initially, I must determine as a matter of law which category the contract provision at issue falls into—clear or ambiguous. *Kroblin Refrigerated Xpress, Inc. v. Pitterich*, 805 F.2d 96, 101 (3d Cir.1986). "[A]mbiguous writings are interpreted by the fact finder and unambiguous writings are interpreted by the court as a question of law." *Mellon Bank, N.A. v. Aetna Business Credit*, 619 F.2d 1001, 1011 n. 10

---

**4.** Because I conclude that Mack did not breach the collective bargaining agreement, I do not include in my Findings of Facts any findings with respect to the events which occurred between November 7, 1984, when the parties approved and adopted the contract language at issue in this case, and January 1, 1986, when Mack switched to Equitable. Those facts are not relevant to my determination of what the parties intended when they entered into the contract.

Consequently, I need not address the Company's contention that Mr. Derry altered his notes from the Benefits Committee meeting held on September 12, 1985 in order to make it appear that he had informed the Company that it could not change carriers without the consent of the Union. *See* Defendant's Post–Trial Brief at 10–13.

(3d Cir.1980). Although this is a non-jury case, and I will ultimately make both determinations, it is nonetheless important to distinguish between findings of fact and conclusions of law, especially for purposes of appellate review.

■ In making the ambiguity determination, I must consider the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence offered in support of those meanings. *See Kroblin,* 805 F.2d at 101; *Mellon Bank,* 619 F.2d at 1011. Based on this evidence, I must decide whether "there is objective indicia that, from the linguistic reference point[s] of the parties, the terms of the contract are susceptible of differing meanings." *Mellon Bank,* 619 F.2d at 1011. A contract will be found to be ambiguous if it is reasonably susceptible to different constructions, is obscure in meaning through indefiniteness of expression, or has a double meaning. *Metzger v. Clifford Realty Corp.,* 327 Pa.Super. 377, 476 A.2d 1, 5 (1984).

The contractual provision which is at issue is the second paragraph of Article I, section 2 of Appendix B of the 1984 Master Collective Bargaining Agreement. *See* Findings of Fact, No. 26. In particular, the Union contends that the Company breached the agreement by not complying with the following sentence:

> The Company shall not exercise its option to select an alternate delivery system until the parties have reached mutual agreement on the terms and conditions including restrictions, limitations and definitions that would be applicable to any delivery system other than Blue Cross/Blue Shield.

The Union contends that this sentence "clearly says [Mack] cannot change carriers unless it reaches mutual agreement with the Union on the terms and conditions of coverage." [1986 Trial Transcript at 2.20]. On the other hand, Mack contends that this sentence only prohibits it from switching to an "alternate delivery system." Mack further contends that switching from one insurance carrier to another, both providing health benefits on a fee-for-service system, is not switching to an "alternate delivery system" and that, therefore, it did not breach the collective bargaining agreement.

■ The key to resolving this dispute is resolving the interpretation of the term "delivery system." In order for the Union's interpretation to be correct, the term "delivery system" would have to be synonymous with "carrier." In support of that theory, the Union makes a textual argument by looking to the contract language itself. The Union argues that Blue Cross/Blue Shield, a carrier, is a delivery system because it is referred to as such in the following phrase: "any delivery system other than Blue Cross/Blue Shield." The UAW did not offer into evidence any testimony from either of its two Union representatives, who were present at the November 1, 1984 meeting, as to why they approved the substitution of the term "provider" with "delivery system" and how they interpreted the term "delivery system." If the parties had left the term "provider" in the sentence, I would have no problem in agreeing with the Union's interpretation. However, the fact is that the parties scratched the term "provider" and replaced it with the term "delivery system." Therefore, I must conclude that the parties intended the term "delivery system" to mean something other than a "provider" of health care benefits.

■ Mack, on the other hand, contends that "delivery system" means a system or manner of delivering health insurance benefits as opposed to the organization or company that provides those benefits. In support of this interpretation of the term, Mack offered into evidence the testimony of Mr. Gmitter, the Company's Chief Spokesperson on the Joint Subcommittee on Health Benefits, who was present at the meeting on November 1, 1984 when the term "delivery system" was inserted in the contract. Rather than actually defining the term "alternate delivery system," Mr. Gmitter gave examples of alternate delivery systems—a health maintenance organization, a preferred provider organization, or a preferred provider arrangement.

[1989 Trial Transcript at 70]. Mr. Gmitter distinguished these alternate systems of delivering group health benefits with the traditional fee-for-service system. [1989 Trial Transcript at 90]. Mr. Gmitter testified that he suggested replacing the term "provider" with "delivery system" because he wanted to make sure that the language would permit the Company to exercise the option of changing insurance carriers, as long as that carrier delivered the group health benefits on a fee-for-service system and provided the same terms and conditions of coverage as Blue Cross/Blue Shield. If that were the intent of the parties at the time they approved and adopted the contractual provision, they certainly could have stated the sentence in an alternative and more precise manner. For example, the sentence at issue could have been written as follows: "The Company shall not exercise its option to select an alternate delivery system until the parties have reached mutual agreement on the terms and conditions ... that would be applicable to any delivery system other than a fee-for-service system, such as the current arrangement with Blue Cross/Blue Shield."

I conclude that the term "delivery system" is ambiguous. This term is reasonably susceptible to different meanings. In addition, the use of alternative or more precise language would have put the meaning of this sentence beyond dispute. See Metzger v. Clifford Realty Corp., 327 Pa. Super. 377, 476 A.2d 1, 6 (1984) ("In determining whether a written contract contains ... an ambiguity, the court may consider 'whether alternative or more precise language, if used, would have put the matter beyond reasonable question.'").

Now as fact finder, I must proceed with the task of interpreting the meaning of the term "delivery system." Because I have concluded that this term is ambiguous, I may consider extrinsic evidence to ascertain the intent of the parties when they

adopted and approved Article I, section 2 of Appendix B of the 1984 Master Collective Bargaining Agreement. Linder v. Inhalation Therapy Services, Inc., 834 F.2d 306, 310 (3d Cir.1987). Once I have determined the intent of the parties, I must interpret the contract in order to give effect to that intent.

■■ In 1984, when the parties were negotiating the new collective bargaining agreement, the Union was not happy with the administrative services provided by Blue Cross/Blue Shield. The Union requested the removal of the language in Article I, section 2 of Appendix B requiring the Company to contract exclusively with Blue Cross/Blue Shield. The Union did not seem concerned with which organization provided its members with health benefits. What the Union desired was to establish terms and conditions of health benefits that would be applicable to any organization or provider. The Company, on the other hand, was exploring ways of containing the costs of its health benefits and, thus, did not want to be bound by the contract to one particular organization or one particular system of delivering health benefits.

On November 1, 1984, the parties met to continue negotiating the language contained in Article I, section 2 of Appendix B. Mr. Gmitter, the Company representative, testified that he suggested replacing the term "provider" with the term "delivery system" in order to assure that the Company would have the option of switching to another insurance carrier, as long as the insurance carrier provided benefits on a fee-for-service basis and on the same terms and conditions as Blue Cross/Blue Shield.

Although the Union certainly is aware that the crux of its case is one of contract interpretation [5], it presented no evidence as to what took place at the meeting on November 1, 1984. The Union did not question either of its representatives present at that meeting as to why the term "delivery

5. In its post-trial brief, the Union states that the "central issue before this court is whether Mack's unilateral decision to change health insurance carriers from Blue Cross/Blue Shield to Equitable, without first obtaining the agreement of the Union to the terms and conditions of such health insurance coverage, violated the collective bargaining agreement between the parties." See Plaintiff's Post–Trial Brief at 2. See also 1989 Trial Transcript at 69.

system" was inserted into the Contract or how its representatives interpreted that term. Instead, the Union relies on its textual argument that the plain meaning of the words shows that a delivery system is an insurance carrier.

Because I have found that the term "delivery system" is ambiguous, I am not limited to the four corners of the contract in order to interpret its meaning. I find Mr. Gmitter to be a very credible witness. Since his testimony concerning what happened at the November 1, 1984 meeting is not contradicted, I find that the parties agreed to replace the term "provider" with the term "delivery system" with the intent of providing the Company the option of switching insurance carriers without the Union's consent. At the same time, the parties intended to prohibit the Company from implementing any alternative delivery systems, such as HMOs or PPOs, without the consent of the Union.

Therefore, I interpret the term "delivery system" as used by the parties in Article I, section 2 in Appendix B to mean a *system* or *manner* of delivering health benefits, as opposed to the *organization*, such as a carrier, that actually delivers the benefits. I interpret the term "alternate delivery system" to mean a delivery system other than the traditional fee-for-service system.

The testimony of Mr. Beech, the Company's expert in the field of employee benefits and health care, further supports this interpretation. Mr. Beech testified that the terms "carrier" and "delivery system" are not used interchangeably in the health benefits field. [1989 Trial Transcript at 14–15]. However, Mr. Beech also testified that a carrier could offer a variety of delivery systems. In addition to offering the traditional fee-for-service system, it is customary practice for a carrier to sponsor and establish an alternative delivery system, like an HMO or PPO, either at a specific client's request or on a speculative basis in order to attract customers and sell health insurance products. [1989 Trial Transcript at 15]. The Union did not present any expert witness to contradict Mr. Beech's testimony. Therefore, because

Mr. Beech's testimony is not contradicted and I find him to be a credible witness, I conclude that his testimony concerning the field of employee benefits and health care, in particular the definitions of various terms, is correct and accurate. *See* Findings of Fact, Nos. 8–12.

The 1980 version of Appendix B required the Company to contract with Blue Cross/Blue Shield but provided that the parties could by mutual agreement switch to another carrier. The UAW contends that the 1984 version of Appendix B does not require Mack to contract with Blue Cross/Blue Shield but does require Mack to obtain the Union's mutual agreement in order to switch from Blue Cross/Blue Shield. This is a distinction without a difference. The Union's interpretation of the contract language would mean that "after six weeks of meetings, after preparation of at least three drafts that preceded what is now Plaintiff's Exhibit 4 and Defendant's Exhibit 26, and after lengthy discussion and revision of those drafts before and after a ten-day strike, the parties adopted a contract provision in 1984 that is three times as long yet says exactly the same thing as its predecessor." [Defendant's Post–Trial Brief at 13–14].

■ It is unlikely that the parties intended to say the same thing in the 1984 version of Article I, section 2 as they had said in the 1980 version. If they had, they could have simply left the language unaltered and saved themselves a great deal of time and aggravation. The law prefers a permissible interpretation that gives reasonable, lawful, and effective meaning to a contract provision over an interpretation that leaves a provision unreasonable, unlawful, or of no effect. *Pacemaker Yacht Co. v. NLRB*, 663 F.2d 455, 459 (3d Cir. 1981). Therefore, I will not interpret the changes made to the 1984 version of Article I, section 2 of Appendix B to have no effect and to, in essence, mean the same thing as the 1980 version.

■ I interpret Article I, section 2 of Appendix B of the 1984 Master Agreement as a contract that

1. requires the Company to continue the terms and conditions of coverage, as specified in Appendix B, and to deliver those benefits on the traditional or fee-for-service basis;

2. provides the Company with the option of selecting an alternative delivery system for providing health care benefits, such as an HMO or a PPO, but only after the Company and the Union have reached mutual agreement on the terms and conditions that would be applicable to any alternative delivery system; and

3. provides the Company with the sole discretion of selecting the organization through which its health care benefits are delivered.

This interpretation of Article I, section 2 of Appendix B is logical in light of its bargaining history and the manifest intent of the parties to (1) replace Blue Cross/Blue Shield, [Stipulation No. 7; 1989 Trial Transcript at 70–72], and (2) reserve, for the future, discussions concerning alternative cost efficient systems for delivering health care benefits. [Defendant's Exhibit No. 6, pp. 19–20].

Accordingly, I conclude that Mack did *not* breach Article I, section 2 of the 1984 Master Agreement by unilaterally switching from Blue Cross/Blue Shield to Equitable without the mutual agreement of the Union. Because the Union has not met its burden of succeeding on the merits of its claim that the Company breached the collective bargaining agreement, the Union is not entitled to a permanent injunction.

Further, I conclude that the Union is not entitled to a permanent injunction because the balance of the equities tips in favor of the Company. *See Philadelphia Welfare Rights Organization v. O'Bannon*, 525 F.Supp. 1055, 1057–58 (E.D.Pa. 1981). A court-ordered rollback to Blue Cross/Blue Shield would burden Mack and the beneficiaries under Mack's health benefits plan substantially more than it would benefit the UAW. The Union's interest in its bargaining chip is not absolute as a matter of equity and must be considered in light of the hardship that would inure to the Company and the beneficiaries of the

Company's health benefits plan if I were to order a return to Blue Cross/Blue Shield. *Id.* at 1057.

The Company would suffer a hardship in that it would have to pay at least $750,-000.00 more per year to Blue Cross/Blue Shield for the same services currently being provided by Equitable and with full knowledge that the services provided by Blue Cross/Blue Shield had in the past been highly unsatisfactory. In addition, Mack would be burdened with the monumental task of converting an entire health benefits administration system mid-year and mid-contract. The conversion to Blue Cross/Blue Shield is estimated to take anywhere from three to six months.

The thousands of beneficiaries under Mack's health benefits plan would also suffer a hardship. These beneficiaries have the most vital interests at stake. A return to Blue Cross/Blue Shield would, in effect, mean that their claims for reimbursement for health care costs would be handled much less efficiently. Their ability to obtain proper and prompt reimbursement for the costs of health care for themselves and their families would be substantially impaired. Under Equitable, these beneficiaries are receiving the same benefits which they received under Blue Cross/Blue Shield but without the frustration involved with inefficient claims administration. The Equitable program has been in effect now for more than four years. During that time, the constant barrage of complaints from Union members about administrative inefficiency has ceased and the Equitable program has proven itself to be an efficiently run program. The coverage, including exclusions and definitions, under the Equitable program is identical to that under the Blue Cross/Blue Shield program.

In balancing these competing interests, I conclude that the balance of the equities militates strongly against granting the permanent injunction sought by the Union. The Union's institutional interest in preserving its bargaining chip, although important, does *not* outweigh the substantial harm that would inure to the Company and the beneficiaries of the Company's health

care plan if I were to require a rollback to Blue Cross/Blue Shield.

## IV. CONCLUSIONS OF LAW

1. This Court has jurisdiction over this action pursuant to Section 301 of the Labor–Management Relations Act of 1947, as amended, 29 U.S.C. § 185.

2. Article I, section 2 of Appendix B of the 1984 Master Collective Bargaining Agreement is ambiguous.

3. Article I, section 2 of Appendix B of the 1984 Master Collective Bargaining Agreement did not prohibit Mack from removing Blue Cross/Blue Shield as the insurance carrier and contracting with Equitable for the administration of its health benefits plan.

4. Article I, section 2 of Appendix B of the 1984 Master Collective Bargaining Agreement required "mutual agreement" for a change to an "alternate delivery system." Article I, section 2 of Appendix B, however, did not require mutual agreement for a change in carriers, as long as that carrier delivered benefits on a fee-for-service basis and provided benefits on the same terms and conditions as had Blue Cross/Blue Shield.

5. Because Equitable delivers benefits on a fee-for-service basis and provides benefits on the same terms and conditions as had Blue Cross/Blue Shield, Mack did *not* breach Article I, section 2 of Appendix B of the 1984 Master Collective Bargaining Agreement by switching insurance carriers without the UAW's consent.

6. Because Mack did not breach Article I, section 2 of Appendix B of the 1984 Master Collective Bargaining Agreement, the UAW is not entitled to the injunctive relief that it seeks.

7. I conclude that the balance of the equities tips in favor of the Company, and in consideration of the equities, the Union is not entitled to the permanent injunction which it seeks.

An appropriate order follows.

*ORDER*

For the reasons stated in the foregoing Findings of Fact, Discussion, and Conclusions of Law, judgment shall be entered in favor of defendant and against plaintiff on all counts of the complaint.

IT IS SO ORDERED.